**CONTINENTAL AIR LINES, INC.,**
Plaintiff-Appellee,

v.

**WAGNER–MOREHOUSE, INC.,**
Defendant-Appellant.

**CONTINENTAL AIR LINES, INC.,**
Plaintiff-Appellant,

v.

**WAGNER–MOREHOUSE, INC.,**
Defendant-Appellee.

Nos. 16297–16298.

United States Court of Appeals
Seventh Circuit.

July 19, 1968.

As Corrected Sept. 13, 1968.

Gordon R. Close, Thomas W. Dempsey, Chicago, Ill., Charles W. Kenady, San Francisco, Cal., Lord, Bissell & Brook, Chicago, Ill., for Continental Airlines, Inc.; Cooper, White & Cooper, San Francisco, Cal., of counsel.

John M. Moelmann, Perry L. Fuller, D. Kendall Griffith, Chicago, Ill., for Wagner-Morehouse; Hinshaw, Culbertson, Moelmann & Hoban, Chicago, Ill., of counsel.

Before MAJOR, Senior Circuit Judge, and SCHNACKENBERG and CUMMINGS, Circuit Judges.

MAJOR, Senior Circuit Judge.

This case relates to the adequacy of four loading tubes (bridges) sold to Continental Air Lines, Inc. (Continental) by Wagner-Morehouse, Inc. (Wagner), a California engineering and manufacturing company. The tubes were designed as a facility for transferring passengers between the airport building at O'Hare Field, Chicago, and large jet airplanes. Their unique function was that they could move both horizontally and vertically and thus permit a large aircraft with its broad wingspans to taxi close to the building for loading and unloading.

Pursuant to a sales agreement, embodied in an exchange of letters, the four tubes were installed at O'Hare on April 1, April 26, June 24 and August 5, 1962. On its first day of operation the second tube fell to the ground from an elevated position. The tube was damaged, sent back to California to be modified and rebuilt, and reinstalled at O'Hare in October. On November 18, 1962, that tube, 8' in diameter and over 80' long, fell from a 35° elevated position and crashed into the wing of Continental's 720–B 118-passenger jet aircraft, causing extensive damage.

The total purchase price of the four tubes was $307,583.00, of which amount Continental had paid Wagner $224,146.00. When the tube collapsed on its airplane, Continental stopped payment on its check to Wagner for the balance due, in the sum of $83,021.00.

On June 28, 1963, Continental commenced this diversity action (sometimes referred to as the principal cause) against Wagner by means of a three-count complaint which was predicated on negligence and on the alleged breaches of the express and implied warranties arising from the sales agreement. The charge generally was that the four tubes were improperly designed and manufactured and that inadequate material had been used in their construction. Continental sought damages for the cost of repairing its airplane, for its loss of net profits while the plane was being repaired and for the loss of investment in the tubes, which represented the difference between the value of the tubes as allegedly warranted and their actual value when delivered.

Wagner denied improper conduct and that it had warranted that the tubes would be of good quality and free of defects. It also denied that Continental relied upon it to produce a fit product, and charged that Continental was equally responsible for the construction of the tubes. On February 17, 1964, it filed a counterclaim for the amount of the purchase price which Continental had refused to pay.

The jury returned a verdict in favor of Wagner in the principal cause and a verdict in favor of Wagner on its counterclaim, in the sum of $108,204.62.

The usual post-trial motions were filed by the parties and, after a hearing, the court entered judgment n. o. v. for Continental on its claim for cost of repairs and loss of net profits, in the sum of $275,688.23. The court denied Continental's motion for judgment n. o. v. and alternative motion for a new trial on its claim for loss of investment representing the difference between the value of the four tubes as allegedly warranted and as received. The court denied Continental's motion for judgment n. o. v. and alternative motion for a new trial on Wagner's counterclaim, and entered a judgment in favor of Wagner pursuant to the jury verdict. The court, however, did enter a conditional order for a new trial in the event its judgments n. o. v. are reversed by this court.

In appeal No. 16297 (the principal cause), Wagner appeals from that portion of the judgment which grants Continental a judgment n. o. v. in the sum of $275,688.23, and from that portion of the judgment conditionally granting Continental a new trial. In appeal No. 16298, Continental appeals from that portion of the judgment which denies its claim for $222,646.00, the net difference between the value of the four tubes if manufactured as warranted and their actual value as manufactured; from that portion of the judgment in favor of Wagner based on the latter's counterclaim, and from that portion of the judgment which denies its motion for an n. o. v. judgment on the counterclaim or in the alternative for a new trial on Wagner's counterclaim.

Wagner in its appeal from the judgment in the principal cause states the contested issues as follows: (1) Continental waived its right to move for judgment notwithstanding the verdict by failing to move for a directed verdict at the close of all of the evidence; (2) the trial court erred in granting Continental's motion for judgment notwithstanding the verdict, and (3) the trial court erred in granting a conditional new trial.

Continental in its statement of contested issues concedes that it made no motion either oral or in writing for a directed verdict in the principal cause, but seeks to excuse its failure by relying upon a written motion for a directed verdict in the cross-claim action filed against it by Wagner. It contends that the evidence so overwhelmingly favors it that a contrary verdict based on that evidence could not stand; that it proved by direct and positive evidence that as a direct result of defendant's wrongful conduct it sustained a certain and definite amount of damages for its lost profits and cost of repairs, and that it was entitled to a judgment n. o. v. for the amount of damages so proven. It contends that the court erred in denying its motion for a judgment n. o. v. for damages representing the difference in value between the four tubes as warranted and as actually delivered. Relative to the cross-complaint, Continental contends that because Wagner breached the warranties which it made as to the quality of the tubes, the latter was not entitled to recover on its counterclaim and the court erred in denying plaintiff's motion for judgment n. o. v.

Rule 50(b) of the Federal Rules of Civil Procedure in pertinent part provides:

"Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative."

Continental does not and could not dispute that this rule requires that a specific directed verdict motion must pre-

cede a motion for judgment notwithstanding the verdict.

A similar contention was made in Massaro v. United States Lines Co., 3 Cir., 307 F.2d 299, 303, wherein the court stated:

"United sought, as we have said, judgment n. o. v. against Northern Metal. But United made no motion for a directed verdict under Rule 50(a). We therefore do not have the question of the sufficiency of the evidence before us. [Citing cases.] A motion for a directed verdict is a prerequisite of a motion for judgment n. o. v."

In Glazer v. Glazer, 5 Cir., 374 F.2d 390, 400, the court, referring to defendants' motion for judgment n. o. v., stated:

"The defendants could not assert a ground not included in their motion for a directed verdict. [Citing cases.] We therefore test the judgment n. o. v. by the standards of deficiency asserted by the defendants in their motions for directed verdict and judgment n. o. v. and repeated in their appeal briefs."

In support of its contention that its motion for a directed verdict on the counterclaim was sufficient to excuse its failure to move for a directed verdict in the principal cause, Continental on brief states, "The motion [on the counterclaim] in effect contained the identical issues and grounds as charged by the plaintiff in its principal case: that the defendant had breached its express and implied warranties to manufacture and deliver tubes which were fit for the known purposes intended." Continental argues that the issues and legal questions contained in the motion on the counterclaim are the same as those in the principal cause.

We think the issues in the two causes of action were different. A breach of warranty as to the suitability of the tubes on the part of Wagner would constitute a defense to its counterclaim and afford a legal justification for Continental's refusal to pay the balance provided by the contract. Of course, Wagner's alleged breach of warranty as to the suitability of the tubes was also an issue in the principal cause, but there, Continental had the burden of proof not only that there was a breach of warranty but that such breach was the proximate cause of its damages and that it was free from contributory negligence.

Continental cites a number of cases in support of its thesis that its motion for a directed verdict on the counterclaim should be construed as a sufficient basis for the allowance of its motion for judgment n. o. v. in the principal cause. The courts in most of such cases were considering situations in which a motion for a directed verdict was made in one form or another and the sufficiency thereof was the issue involved. In the instant case, as we have shown, no motion of any kind was filed for a directed verdict in the principal cause and, so far as we can ascertain from the record, the court's attention was never called by Continental to its contention that the evidence relating to the principal cause was insufficient to present a submissible issue.

No good purpose could be served in the citation or discussion of the numerous cases relied upon by Continental on this point. It is sufficient to refer to the three cases which it designates as the most important. Mosley v. Cia. Mar. Adra S. A., 2 Cir., 362 F.2d 118; Grey v. American Airlines, Inc., 2 Cir., 227 F.2d 282, and Mullen v. Fitz Simons & Connell Dredge & Dock Co., 11 F.R.D. 348 (N.D. Ill.E.D.1950).

In Mosley, the defendant had filed a motion for a directed verdict against plaintiff but neglected to file a written motion for a directed verdict against the third party defendant. A judgment n. o. v. was entered in favor of the defendant in the third party action. Defendant's counsel stated to the court (362 F.2d page 121), "Your Honor, the defendant renews its motion to dismiss the complaint and for a directed verdict on the ground that the evidence *is insufficient on which to go to the jury on any of these issues that have been raised in this case*." (Emphasis added.) The

court construed the emphasized language as a motion for a directed verdict in both the principal case and the third party action.

In the instant case, in contrast, no motion was made which encompassed the issues involved in the principal cause. During the lengthy discussion of the various motions and instructions at the close of all of the evidence, only a single reference was made by Continental's counsel to a directed verdict, when he stated, "I filed a motion for a directed verdict on the counterclaim at the close of all the evidence. I just filed the written motion. I do not know that the record shows any ruling on that." In response to this statement, the court denied the motion.

In Grey, the action was for damages for the death of a number of persons, including Sophie Goldberg. The defendant failed at the close of the evidence to include her name in a motion for a directed verdict. The Court of Appeals affirmed a judgment n. o. v. in favor of the defendant notwithstanding its failure to include the name in its motion for a directed verdict. In so doing the court stated (227 F.2d page 284):

> "From the outset defendant urged that there could be no recovery in excess of $8300 for the death of either decedent; motions for directed verdicts with respect to the claims arising out of each of the two deaths were made at the close of plaintiffs' case; the contention was again made in extenso at the close of all the evidence. It was mere inadvertence that no reference was again made specifically to Sophie Goldberg."

In Mullen, the case was tried on a three-count complaint. The defendant made an oral motion for a directed verdict on all counts but later filed a written motion which omitted count 3. The court held that it had jurisdiction to rule on the oral motion, which included count 3. In contrast, in the instant case there was no motion, oral or written, for a directed verdict in the principal cause and

no request or statement by Continental's counsel which can be construed as such.

We conclude that the court erred in entering a judgment n. o. v. in favor of plaintiff in the principal cause because of its failure to move for a directed verdict at the close of all of the evidence, as required by Rule 50(b). Perhaps we have devoted more attention to this point than serves any good purpose for the reason that a contrary holding would not change the end result. This follows from our conviction that the evidence when considered in the light most favorable to Wagner, as it must be, presented a submissible jury issue and that Continental was not entitled to an n. o. v. judgment.

As this court stated in Ziegler v. Equitable Life Assurance Society of United States, 7 Cir., 284 F.2d 661, 663:

> "In reviewing the ruling of a trial court on a motion for a directed verdict or a motion for judgment notwithstanding the verdict we are governed by the same standards. Such motions should be denied 'where the evidence, along with all inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions.'"

(See also our decision in Smith v. J. C. Penney Company, 7 Cir., 261 F.2d 218, 219, and Pinkowski v. Sherman Hotel, 7 Cir., 313 F.2d 190, 192, and cases therein cited.)

The trial court at the hearing on the post-trial motions stated:

> " * * * in order to put this in a posture which I think will bring about the least amount of judicial activity, if I might place it in that manner, and at the same time to reflect my reaction to the evidence, which is on the complaint in chief that the evidence was overwhelming and that 12 jurors should not disagree but that there should be judgment for the plaintiff, I am going to allow the motion for

judgment notwithstanding the verdict for the plaintiff and enter judgment on two of the three of the matters which the jury were permitted to determine."

We have read all of the trial testimony as it appears in the appendices supplied by the respective parties—much of it by engineers and other professional people, some of it highly technical and difficult to understand—and, with all due respect to the trial Judge, we think he erred in allowing Continental's motion for judgment n. o. v. on the ground that the evidence was overwhelming in its favor. We need not dwell on the oft repeated rule that it is not our function to weigh the evidence but to determine only if there was evidence favorable to Wagner, together with the inferences to be drawn therefrom, from which reasonable men in the fair and impartial exercise of their judgment might reach different conclusions. (See cases cited above.)

We think the evidence presented a submissible issue and, with the rule lastly stated in mind, we think there was evidence which affords ample support for the jury's verdict.

As a reviewing court, we have no need to enter into a detailed discussion of the conflicting evidence as to the adequacy of the tubes in controversy. We need do no more than point out some of the evidence favorable to Wagner which, if believed by the jury, justified its verdict. In 1960, Dakin, Continental's manager of facilities, presented to Wagner sketches of passenger-loading bridges that could be raised off the ground, instead of the accordion type which sat on the ground. Discussion followed between the parties as to the size of the tube and its various mechanisms. Wagner suggested hydraulic power, which Continental approved because airlines used and were familiar with it. Wagner was authorized to perform engineering studies, during which the parties were in frequent conference. Koster, Wagner's chief engineer, was in charge of the design of the tubes. Preliminary drawings and calculations were submitted to Schaffer, Continental's architect, who submitted them to Naess and Murphy, architects for the City of Chicago. Asrow, a structural engineer for such architects, reviewed the plans and gave the opinion that the calculations and design were in accordance with accepted engineering standards.

Much of the expert testimony has to do with the alleged deficiency in the mechanism which was provided for raising the tubes into a vertical position. The lifting ram which lifts the tube vertically runs from the bottom of the tube to the base of the tower structure or A-frame which contains the mechanism on which the tube pivots. The tube is supported by this lifting ram and two trunnion pins. The trunnion pins are located on each side of the tube at the end of the A-frame. They are mounted in a trunnion ring or collar made of aluminum block and steel plate which encircles the end of the tube. Wagner's engineer, Koster, selected the steel for the trunnion pins. He described it as stress proof steel, manufactured by LaSalle Steel Company. Wagner had used this steel for years for pins and critical shafts and had found it satisfactory.

Wagner on brief sets forth the testimony of a number of witnesses which, if accepted, would justify a finding that the tubes were not improperly or negligently designed. There was evidence (1) that the calculations concerning the trunnion pins were made in accordance with standard engineering principles as of 1962; (2) that the design of the trunnion pins and operating elements was in accordance with the usual and customary engineering practices in 1962; (3) that the loading bridge or tube as designed was reasonably safe for use as a loading bridge for passengers to an aircraft; (4) that Wagner prepared 350 to 400 drawings and made numerous calculations, utilizing not only its own engineers but also those of a consulting firm; (5) that the plans and calculations were submitted to Schaffer, Continental's architect, at its request; (6) that the architect for the City of Chicago reviewed the

calculations and designs of the loading bridge and, after certain suggested changes were made, approved the design; (7) that the steel used to manufacture the trunnion pins was suitable for such use; (8) that the tensile strength of normal structural steel is from 50,000 to 75,000 psi [1], and that the tensile strength of the steel used in the trunnion pins was between 125,000 and 135,-000 psi; (9) that the steel used for the trunnion pins had a guaranteed minimum yield strength of 100,000 psi; (10) that in numerous tests made after the occurrence it was determined that the loading capacity of the trunnion pins used by Wagner averaged 171,000 pounds; (11) that the maximum load condition on the trunnion pins produces a pin load of 60,600 pounds and a bending and direct stress in the pin of 46,000 psi and that this results in a safety factor of 2.72; (12) that in the absence of a Code requirement by the City of Chicago for a factor of safety in a structure of this type, the City's architects applied a factor of approximately 2, and (13) that only the trunnion pin in tube #2 fractured, even though #1 was in operation 528 days, #3 478 days and #4 105 days, and the pins on these tubes did not fail.

Wagner calls attention to testimony from which it argues with some plausibility that a jury might reasonably have found that the alleged failure of the tubes was due to the improper manner in which they were operated by Continental. There is support for this theory in the testimony of Continental's expert witnesses.

Dr. Charles Miller, a civil engineer, who made an examination of the tubes subsequent to the occurrences in question, testified, "On all of the tubes that were out there, there was rather serious permanent deformation within this support structure, indicating that much higher loads had been applied to it than should have been applied to the structure or certainly than was anticipated in the design of the structure."

Wilbur Tuggle, a structural engineer, made a careful inspection of three of the supporting structures and, referring to the condition he found, stated, "The amount of force in order to gouge that, with two surfaces rubbing against one another, must have been very, very large," and, " * * * only an extremely excessive force could have produced this kind of deformation of the steel trails."

There was evidence that a rubber flap jammed between the tube and the sphere, which could have caused additional loading on the pin. When the flap jammed and Continental could raise the loading bridge only 10 or 12°, it made no effort to find the cause of the trouble but instead made repeated attempts to raise the tube by applying excessive pressure. When Continental reported this to Wagner, it advised Continental to stop immediately, look for friction and in particular to remove the bearing housing and examine the bearing. Continental did look for friction but did not remove the bearing housing, which might have revealed the beginning of distortion of the spacer. Continental's personnel were present when the tubes were installed, but did not check the rubber flap until after the trouble had occurred and did not know if anyone had adjusted the position of the rubber flap at the time of the installations.

There was evidence that Wagner furnished Continental with an operating manual which instructed it to check the pressure in the holdback rams daily and maintain it at 500 psi. Instead, Continental operated the bridges with only 200 psi, which caused deformation of the unit.

On the night before November 18, 1962, the date the tube fell on the airplane, Continental's tube operator heard a loud noise—a bang—from the A-frame,

[1]. Pounds of load or force is the actual weight of something. It is measured in pounds. Stress is the measure of what that load or force does to another object. It is measured in pounds per square inch (psi).

which he reported to his supervisor. On the morning of the occurrence, the same operator had difficulty moving the tube sideways. His superior attempted to do so and failed. The supervisor instructed that the tube be taken to an upright position, at which time the accident occurred. No effort was made to determine whether something was wrong before lifting the tube over the wing of the airplane.

In considering the sufficiency of the evidence to present a submissible issue and in support of the jury's verdict, it is pertinent to keep in mind that the installation of the tubes was not done by Wagner but by a third party, at the request of Continental, and that Wagner had nothing to do with the operation of the tubes. That was solely under the control and management of Continental.

■ We have attempted to set forth in brief form some of the evidence which supports and justifies the jury's verdict in favor of Wagner. Of course, there was contradictory evidence with which we need not be too much concerned. It was not the function of the trial court and neither is it that of this court to weigh the testimony which proves or tends to prove the conflicting theories of the parties. That was peculiarly the function of the jury as the trier of the facts, and it is our judgment that the evidence furnished a substantial basis for its verdict in favor of Wagner. It follows that a judgment on that verdict should stand, and that the court erred in entering an n. o. v. judgment in favor of Continental.

■■ Our discussion of the evidence, which we hold presented a submissible jury issue and which substantially supports its verdict, in the main disposes of the court's order granting to Continental a conditional new trial. In this connection it is pertinent to note that the trial with all its technical and professional aspects was remarkably free from error; in fact, with one exception hereinafter noted, no complaint is made by Continental on that score. Thus, the sole issue was one of fact, decided by the jury adversely to Continental. The granting of the conditional new trial was based upon the premise that the jury's verdict was contrary to the manifest weight of the evidence. We conclude that granting a conditional new trial was erroneous. As was said in Gebhardt v. Wilson Freight Forwarding Co., 3 Cir., 348 F.2d 129, 133:

"If the evidence in the record, viewed from the standpoint of the successful party, is sufficient to support the jury verdict, a new trial is not warranted merely because the jury could have reached a different result. [Citing cases.] Neither the trial court nor this Court may substitute its judgment for that of the jury on disputed issues of fact."

While the court granted a conditional new trial solely upon the insufficiency of the evidence, Continental argues that the court committed reversible error in failing to instruct the jury as a matter of law that Wagner expressly and impliedly warranted the tubes to be of good quality. This point is not mentioned by Continental in its statement of contested issues.

Even so, we think it is of sufficient importance to justify some discussion. The nature and extent of Wagner's warranty must be determined entirely from documentary proof, all of which was introduced in evidence by Continental and submitted to the jury. Such documents consist of a proposal made by Wagner on August 15, 1961, Continental's purchase order of October 19, 1961, and Wagner's acceptance of such order on October 26, 1961. Wagner's original proposal included a warranty provision as follows:

"The merchandise manufactured by The Company is warranted to be in accordance with specifications, within customarily accepted tolerances, and to be free from defects due to improper workmanship or material when operated under normal conditions, but said warranty shall not apply to any parts which have been altered or repaired outside The Company's factory

or which have been improperly applied or installed or subjected to abuse, neglect or accident."

Continental's purchase order stated, "as per your proposal and specification dated August 15, 1961." On the reverse side of this order certain conditions were stated, including:

"Warranties.—Seller warrants that the articles to be supplied under this contract are fit and sufficient for the purpose intended; that they are merchantable, of good quality and free from defects * * *."

Wagner's letter of acceptance stated:

"We note your order specifies four loading bridges per our quotation of August 15, 1961, and we assume this includes approval of the notes, terms and conditions made a part thereof."

The letter specified five conditions stated in the purchase order with which Wagner did not agree, none of which made reference to warranties. Continental argues that its purchase order and Wagner's acceptance constitute the entire contract, thus ignoring Wagner's original proposal.

Continental cites cases in support of the general proposition that the interpretation of a clear and specific contract wholly in writing is solely a matter of law for the court and should not be submitted to the jury as a question of fact. Continental urges application of this principle on the premise that the sole contract between it and Wagner insofar as warranties were concerned is contained in Continental's purchase order and Wagner's acceptance thereof. It ignores, as of no consequence, Wagner's original proposal, although it was introduced in evidence by Continental. The premise is not tenable. The written documents do not reveal a "clear and specific contract" but, in our view, the warranty provision contained in Wagner's original proposal became a part of the contract which was finally consummated by the parties. This is so for the reason that Wagner's acceptance of Continental's purchase order in language above quoted specifically reserved "conditions made a part thereof."

The court instructed the jury at length as to the meaning of express warranty, implied warranty and merchantability of products, submitted the documentary proof to the jury and left to it a determination of the warranty made by Wagner. Certainly there can be no doubt but that the jury understood that Wagner had warranted its product. The question was, which warranty was controlling? If the jury relied upon Wagner's original warranty provision, Continental cannot complain because, in our view, that provision was controlling. On the other hand, if the jury relied upon the warranty provision contained in Continental's purchase order, which perhaps is more favorable to it, Continental is in no position to complain. In any event, there remained as issues for the jury whether any breach of warranty due to improper design was the proximate cause of the damage claimed and whether the loading bridge fell because of improper and negligent operation by Continental.

We hold that there was no prejudicial error in the court's failure to instruct the jury as requested by Continental.

In its last point in the principal cause, Continental argues that the court erred in denying its motion for a judgment n. o. v. for its lost investment in the four tubes. It points out that the total purchase price for the four tubes was $307,-583.95, and that it finally sold them as scrap for $1,500.00. Continental claims it was entitled to recover the difference between the purchase price, which represents the value of the tubes as warranted, and the value of the tubes as delivered ($1,500.00), less $83,437.95, which remained unpaid on the purchase price. This issue was submitted to the jury, as were other issues bearing upon the measure of damages and, as already shown, the jury returned a verdict exonerating Wagner from liability.

We have already held that the jury verdict must stand, and it follows that the court did not err in denying Conti-

**32**

nental's motion for a judgment n. o. v. in the matter just discussed.

The jury found in favor of Wagner in its cross-claim (appeal No. 16298) in the amount of $108,204.62 (the unpaid balance on the contract, plus interest). The court denied Continental's motion for a judgment n. o. v. and entered judgment on the jury verdict in favor of Wagner. From this judgment Continental appeals.

Continental states the contested issue relating to this point in substance as follows: that Wagner's performance of its warranties of quality was a condition precedent to its right to obtain the sales price, and the trial judge having found that the overwhelming proof was that Wagner had breached these warranties of quality, that the court erred in denying Continental's motion for judgment n. o. v. Continental on brief states:

"The trial judge found and the evidence overwhelmingly showed that the Defendant breached its express and implied warranties under the contract. This finding makes it manifest that the defendant failed to perform under the contract and, accordingly, the plaintiff was not obligated to pay under the contract. The condition precedent was not satisfied."

In the principal cause we have rejected the premise that the evidence overwhelmingly showed that Wagner breached its express and implied warranties, and we have concluded that that issue as well as other issues in the principal cause were for the jury. Likewise we conclude that the issues raised by the counterclaim were for the jury and that the court did not err in its denial of Continental's motion for a judgment n. o. v. We are not able to discern why the court should reject the jury's verdict in the principal cause and embrace it in the counterclaim case. It is our view that the verdict of the jury should prevail in each case and we so hold.

We hold (1) that the court erred in entering a judgment n. o. v. in favor of Continental representing the cost of re-

pairing the damaged aircraft and the loss of net revenue due to the inability to operate said aircraft during the period of repair; (2) that the court properly denied Continental's motion for a judgment n. o. v. for the difference between the value of the four loading bridges if manufactured as warranted and the actual value as manufactured; (3) that the court properly denied Continental's motion for a judgment n. o. v. on the counterclaim, and (4) that the court erred in awarding to Continental a conditional new trial both on the principal cause and on the counterclaim.

The judgment in the principal cause is reversed, with directions to enter a judgment in favor of Wagner in accordance with the jury verdict. The judgment on the counterclaim in favor of Wagner is affirmed.