Joseph S. DeSANTIS, by his guardian ad litem, et al., Plaintiffs-Appellees,

v.

PARKER FEEDERS, INC., Defendant and Third-Party Plaintiff-Appellant,

v.

Jeanne DeSANTIS and Richer DeSORCY, as Special Administrator of the Estate of Arthur C. Schrank, Third-Party Defendants-Appellees.

No. 76–1332.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1976.
Decided Nov. 18, 1976.

John W. Fetzner, Hudson, Wis., for plaintiff-appellant.

Eugene O. Gehl, Madison, Wis., for plaintiffs-appellees.

Before FAIRCHILD, Chief Judge, and CUMMINGS and TONE, Circuit Judges.

FAIRCHILD, Chief Judge.

This is a diversity suit brought by Joseph S. DeSantis, a 12-year old boy, and his father, John T. DeSantis, against Parker Feeders, Inc. for injuries sustained by the boy in an accident occurring on May 6, 1969.[1] On that date, Joseph DeSantis, while playing with younger brothers, became entrapped in the sharp blades of the auger part of his father's automatic cattle feeder. As a result, the boy lost his left leg from the knee joint down, his big toe and a portion of the second toe on his right foot, and suffered deep lacerations to the back of his left thigh and hip.

The cattle feeder involved in the accident was constructed entirely from parts manufactured by defendant. Though defendant sold these parts separately, one from the other, and though Mr. DeSantis was free to have substituted the parts of another manufacturer for those of defendant, he was not free to omit any part purchased from the cattle feeder. Each was absolutely necessary to the assembly of a working feeder system.[2]

The only part manufactured by defendant that was not so absolutely necessary to a working cattle feeder system was a cover for the trough and auger parts that could be obtained by special order. The cattle feeder in which Joseph DeSantis was injured did not have a trough/auger cover. There is no evidence that defendant made any effort to insure that Mr. DeSantis or any purchaser of its cattle feeder parts, especially of its trough and augers, also purchased such safety covers. In fact, pictures in defendant's promotional advertising never depicted an operating cattle feeder equipped with a cover. As a result, the district court held Parker Feeders strictly liable for the boy's injuries.⸱ Defendant appeals from the judgment of the district court, charging as error the denial of its motions for a directed verdict, judgment notwithstanding the verdict and a new trial.

## MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT

Defendant makes two arguments for reversing the trial court's denial of its motions for a directed verdict and judgment notwithstanding the verdict: (1) that, as a matter of law, the products it manufactured were neither defective nor unreasonably dangerous, and (2) that it is not liable for injuries sustained when its products are not used for their intended purpose.

■ A directed verdict is appropriate " 'only when the evidence gives rise to no dispute as to the material issues or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion.' " *Anderson v. Joint School Dist.*, 24 Wis.2d 580, 583, 129 N.W.2d 545, 547 (1964), *citing Smith v. Pabst*, 233 Wis. 489, 288 N.W. 780 (1940) and *Rusch v. Sentinel-News Co.*, 212 Wis. 530, 533, 250 N.W. 405 (1933). *See also Tombal v. Farmers Insurance Exchange*, 62 Wis.2d 64, 68, 214 N.W.2d 291 (1974). Thus, in determining whether or not the trial court erred in failing to direct a verdict or in denying judgment notwithstanding the verdict, this court must consider the evidence in the light most favorable to the party against whom the verdict was sought to be directed. *Lambie v. Tibbits*, 267 F.2d 902, 903 (7th Cir. 1959); *Tombal v. Farmers Insurance*

---

1. The parties pose no conflict of laws problem, being in apparent agreement that the state law that should control substantive matters is that of Wisconsin. That state being the situs of the injury as well as the residence of the injured plaintiff, we agree that it has the principal interest of any state in the rules applied to the case.

2. To the extent plaintiff did enjoy discretion in the assembly of his feeder, it was primarily in regard to the route by which the system would transport his feed. By arranging for troughs that met at right angles, Mr. DeSantis was able to construct a system that carried feed both down from a silo and out to a feed yard, thus adapting defendant's products to the particular needs of his farm.

*Exchange, supra,* 62 Wis.2d at 68, 214 N.W.2d 291. The proper inquiry, then, is whether the DeSantis' evidence is such that the jury could reasonably have found the defendant's product was defective or unreasonably dangerous and that it was being used in a way intended by defendant. For the reasons set forth below, we are persuaded such evidence was presented and, accordingly, we affirm the ruling of the trial court.

With respect to the issue of defect and dangerousness, defendant's argument on appeal focuses on its assertion that it was but one manufacturer of component parts from which cattle feeders could be assembled. Which of these parts did and did not find their way into the DeSantis' feeder, it argues, was a matter completely out of its hands and completely up to Mr. DeSantis and Mr. Schrank, his supplier, who together designed and assembled the feeder in question. Accordingly, ultimate responsibility for any defect or dangerousness in the feeder should rest with Mr. DeSantis and Mr. Schrank.

We are unpersuaded by this argument for two reasons. First, viewing the evidence in the light most favorable to the plaintiff, it was not unreasonable for the jury to conclude that Parker Feeders was in fact the manufacturer, not simply of the parts that comprised the DeSantis' feeder, but of the feeder itself. As already observed, every part that Mr. DeSantis purchased to construct his feeder was dependent on every other part to accomplish any useful purpose, and each of these parts was manufactured by Parker Feeders. Thus, if it was deemed a defect in design or unreasonably dangerous for the DeSantis' feeder to operate without a cover, we do not consider it unreasonable for the jury to have decided that Parker Feeders, as manufacturer of all its parts—of what in essence then was a "Parker King-O-Matic Cattle Feeder," a product always depicted uncovered in defendant's promotional literature—must be held strictly liable for injuries resulting from such defect or danger.

Second, Parker Feeders' argument is unpersuasive because, even if the jury believed it to be simply the manufacturer of component parts, the rule in Wisconsin is that,

> Where there is no change in the component itself, but it is merely incorporated into something larger, and where the cause of harm or injury is found . . . to be a defect in the component part, . . . as to the ultimate user or consumer, the strict liability standard applies to the maker and supplier of the defective, component part. *City of Franklin v. Badger Ford Truck Sales, Inc.,* 58 Wis.2d 641, 649, 207 N.W.2d 866, 870 (1973).

The evidence supports the conclusion that no material change was made in the trough, auger, or any other Parker Feeders' part in assembling the DeSantis' feeder, that each was "merely incorporated into" the whole feed system. As such, it would have been reasonable for jury to conclude that it was a defect in the design of, or a danger in, the auger, trough, or some other part, for Parker Feeders to sell such part without a cover attached or without strong clear warnings that such part only be incorporated into feeder systems provided with covers.

With respect to the issue of intended use, Parker Feeders argues that it should not be expected to have foreseen that young children would use a cattle feeder to play a game involving hiding squirt guns. We cannot agree. We do not consider it unreasonable that the jury, presented with evidence of defendant's promotional material advertising,—"Even a child can do your feeding"—found exposure of Joseph DeSantis to the cattle feeder something defendant should have foreseen. Nor are we persuaded that the feeder was being misused by the boy at the time of the accident. The plaintiff was injured because, while climbing over the feeder's trough and auger, he misjudged the distance, failed to step widely enough, and found himself caught in the mechanism's whirling blades. It was irrelevant to this accident that the boy and his brothers had turned on the

cattle feeder with the assistance of a pitch-fork. It was irrelevant that their reason for turning on the machine was to play a game involving squirt guns. What is relevant is that a child—whom defendant purported was capable of operating the cattle feeder—had turned on the machine; that the machine at the time of the accident was operating in exactly the same manner and with no greater risk than if feed were being transported in it; and that when the child sought to cross over the feeder, its failure to be covered made it possible for him to become caught in the device. It was for the jury to decide whether defendant should have foreseen that a user might step across the cattle feeder in the course of its operation. We cannot say it was unreasonable for them to have decided such use was foreseeable.

## MOTION FOR A NEW TRIAL

Defendant charges eight errors committed below warrant this court's grant of a new trial: (1) that the court's instruction regarding standard of care in reference to strict liability was inappropriate; (2) that the court's use of the term "Parker King-O-Matic Feeder" in the instruction on strict liability was unduly prejudicial; (3) that the court's use of the singular word "product" in Question 1 of the special verdict was similarly prejudicial; (4) that the trial court's instruction on duty to warn was inappropriate given the open and obvious nature of the danger; (5) that the trial court erred in not giving defendant's suggested instruction on the duty of care owed by the installer of the feeder; (6) that the court's instruction on the possibility of plaintiff's suffering posttraumatic personality disorder was unnecessarily duplicitous; (7) that the testimony of plaintiff's witness, Mr. Wrage, subjected defendant to undue surprise and prejudice; (8) that the dam-

ages awarded to the plaintiff were excessive; and (9) that the answers to Questions 1–9 of the special verdict were not supported by the weight of the evidence.

The trial court has already considered most of these charges of error, either in the course of trial objections, or as motions after trial. We agree with its decision that all are insufficiently supported to warrant granting defendant a new trial.

■ With respect to defendant's challenge to the instruction on strict liability, the principal objection seems to be to inclusion of the phrase "even though he exercised all possible care," given that the alleged defect related to design.[3] But Section 402A of the Second Restatement of Torts, adopted by Wisconsin courts in *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967) states that,

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or to his property . . . *although . . . the seller has exercised all possible care* in the production and sale of his product . . . .. *Id.* at 459, 155 N.W.2d at 63. [Emphasis added.]

And in *Arbet v. Gussarson*, 66 Wis.2d 551, 225 N.W.2d 431 (1975), Wisconsin's Supreme Court ruled that "the fact that the defect relates to *design* rather than *negligent manufacture* makes no difference" in applying the Restatement rule. *Id.* at 556, 225 N.W.2d 435. *See also Schuh v. Fox River Tractor Co.*, 63 Wis.2d 728, 218 N.W.2d 279 (1974). The decisions in *Dippel, Arbet* and *Schuh* make clear then that the instruction given by the trial court was a completely accurate statement of Wisconsin law on strict liability and that defendant's argument for a special instruction in the case

---

**3.** The instruction of the trial judge read as follow:

A manufacturer of a product who places on the market a defective product which is unreasonably dangerous to a human being or to his property and which is expected to and does reach the person without substantial change in the condition in which it is sold, is regarded by law as negligent even though he has exercised all possible care in the preparation and sale of the product, provided the product was being used for the purpose for which it was designed and intended to be used.

because the defect related to design is without merit.

■ Defendant cites as further error the trial court's use of the term "Parker King-O-Matic Feeder" in the fifth paragraph of the instruction on strict liability,[4] arguing that this term indicated to the jury that Parker Feeders were liable for any defect which existed in the cattle feeder and auger system, as opposed to allowing for a determination of defect in each of the system's component parts as well as in its assembly. The record reveals much discussion among the counsel for the parties and the trial judge, both during the trial and in the course of drafting the instruction, as to the most neutral way to refer to whatever product it was the design or manufacture of which Parker Feeders was responsible for. Originally, the instruction referred to a "Supreme Auger System." When the word "system" was objected to, the trial court adopted the term "Parker King-O-Matic Feeder," explaining, "The language here came off the company's brochure which apparently was intended to refer to whatever they did, parts or otherwise." It seems to us the court's use of the term in no way precluded defendant from making its argument that it was simply the manufacturer of component parts, and, therefore, we find no prejudicial error.

■ For the same reason, we find no error in the trial court's use of the singular term "product" as opposed to the plural "products" in Question 1 of the special verdict.[5] The record is replete with examples of objections made by and disputes between the parties as to the appropriate way to describe whatever it was about the DeSantis' cattle feeder for which Parker Feeders was responsible. From these, we are confident that if the jury understood nothing else about the positions of the parties in the case on the various issues, they understood that defendant did not consider itself responsible for the feeder as a whole, but only for its component parts.

■ Defendant is, of course, correct when, in making its next argument,[6] it notes that a cattle feeder is an obviously dangerous machine and that the risks of using it are not entirely latent. But it does not necessarily follow that the manufacturer of such a machine has no duty to warn the public of the precise nature of the dangers involved. The rule in Wisconsin is that in any case where the average consumer might not reasonably anticipate and fully appreciate the dangerous condition of a product or the attendant risk of injury, the manufacturer has a duty to warn. *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.*, 69 Wis.2d 326, 230 N.W.2d

4. The instruction read:
  You are further instructed that before you can answer the first question yes, that the Parker King-O-Matic Cattle Feeder was defective so as to be unreasonably dangerous, you must be satisfied by the greater weight of credible evidence to a reasonable certainty that: (1) the Parker King-O-Matic Cattle Feeder was in a defective condition; (2) the defective condition made it unreasonably dangerous to persons or property; (3) the defective condition of the Parker King-O-Matic Cattle Feeder existed when it was under the control of the manufacturer; and (4) it reached the user without substantial change in the condition in which it was sold.

5. Question 1 of the special verdict read:
  Was the product in question as designed and manufactured by Parker Feeders, Inc. defective so as to be unreasonably dangerous at the time it left that company's possession? Answer _____.
     *Yes or No*

6. Defendant challenges the appropriateness of the following instruction:
  A manufacturer or supplier of a product must give warning of any dangerous propensity of an article produced or sold by him inherent in the product or in its use of which he knows or should know and which human beings coming in contact with the product should not ordinarily discover. The warning should be such that if followed would make the product safe for human beings. To comply with this duty the manufacturer or supplier must appropriately label the product, giving due consideration to the likelihood of accident and the seriousness of consequences from failure to so label it as to warn of any dangers that are inherent in it and its use or that may arise from the improper handling or use of the product.

794 (1975). In this case there is expert testimony that an auger is a more dangerous piece of equipment than the DeSantises might have suspected, especially since its blades become sharper, rather than duller, over time.[7] Thus, however much Parker Feeders might be entitled to argue that since it did not ultimately assemble the DeSantis' cattle feeder, it could not see to it that the machine was covered, indeed, however much it might be entitled to argue the technical impossibility and economic impracticality of attaching a cover to a part such as an auger (or trough), it remained appropriate for the jury to decide whether Parker Feeders, as manufacturer of an auger, the increasing dangerousness of which might not be perceived by the average consumer, should have had a warning, either on the machine itself, or at least, enclosed with it when shipped, that indicated the necessity of using a cover, manufactured by Parker Feeders or by some other company, when operating any feeder incorporating its auger. Accordingly, it was appropriate for the court to give an instruction in this regard.

■ We do not accept Parker Feeder's argument that it is absolved from any liability in regard to this duty by the fact that young Joseph DeSantis would not have been likely to read or understand any warning. What is important to our decision is that the boy's father would have understood the warning and have been on notice to take steps which, in this case, would have avoided the injuries suffered by his son. If Parker Feeders was indeed only the manufacturer of a component part, and if that part could be a serious hazard if it were

incorporated into a machine without certain safety devices, it owed *all* who might come in contact with the part the duty to warn those who would assemble any machine in which its part was included that the completed machine should not be installed without the inclusion of such necessary devices.

■ Defendant next argues that the trial court erred in not giving its proposed instruction on the duty of care owed by the installer.[8] This is irrelevant to its motion for a new trial as against Joseph DeSantis. That other parties may also have been negligent in regard to the DeSantis' cattle feeder in no way absolves Parker Feeders from the duties it had to those injured by its products when they were incorporated in such feeders. Under the circumstances, the argument could only be relevant, (1) to the apportionment of negligence among Parker Feeders, Arthur Schrank and John DeSantis, and, in turn, Parker Feeders' right to contribution, and (2) to John DeSantis' own cause of action. Defendant does not, however, seem to be requesting a new trial limited to these parties. In any case, we find that the trial court, though it did not give defendant's precise proposed instruction as to the duty of care owed by installers, did make clear that the acts or omissions of more than one party could be deemed to have contributed to Joseph DeSantis' injuries. The questions in the special verdict required the jury to make a particular finding as to the negligence of Parker Feeders, Arthur Schrank and John DeSantis. Further questions required the jury to apportion fault among the parties in proportion to which their negligence was determined to have contributed to the acci-

---

7. Nothing in the record suggests that Joseph DeSantis or his father had any special training or experience with augers or automatic cattle feeders. In fact, Mrs. DeSantis testified that prior to acquiring the cattle feeder involved in her son's accident, the family had had no mechanical assistance in feeding its stock. Thus, this court's discussion of a lesser duty to warn those with special expertise in *Collins v. Ridge Tool*, 520 F.2d 591 (7th Cir. 1975), is inapposite to the facts in this case.

8. Defendant submitted the following instruction:

It is the duty of a person, who, while installing equipment, has observed defects in the same, to exercise ordinary care to repair such defects so as to render such equipment safe for its intended use, or give the buyer or user thereof notice of the danger involved in the use thereof.

dent. In this light, we cannot say that defendant, who was free to introduce evidence showing negligence by Mr. Schrank and Mr. DeSantis and to argue that such negligence was the primary cause of the boy's accident, was unduly prejudiced by the court's decision not to give its proposed instruction.

■ Nor are we persuaded to grant a new trial as to damages based on defendant's challenge to the court's instruction on plaintiff's possible posttraumatic personality disorder.[9] Dr. George Calden did testify that Joseph DeSantis was inordinately preoccupied with physical injuries and with feet. He gave his opinion that the injuries Joseph DeSantis had suffered might make it more difficult emotionally for him to enter into sexual relationships as he grew older. This evidence made it appropriate for the trial court to instruct the jury to consider compensating the plaintiff for specific emotional injuries outside the general realm of physical pain and suffering. The defendant had objected to the fact that the instruction, as originally drafted, used the word "neurosis." The court, therefore, adopted the phrase chosen by Dr. Calden to describe his diagnosis of Joseph DeSantis' condition: "posttraumatic personality disorder." We find no error in the trial court's instruction that the jury consider whether the plaintiff suffered from such a disorder.

■ Defendant cites as further evidence of reversible error as to damages the trial court's refusal to strike the testimony of John Wrage, a psychologist and employment counselor, as to Joseph DeSantis' future earning capacity. Defendant claims it was prejudiced insofar as it was not informed prior to trial that Mr. Wrage was a psychologist nor furnished with the report—four sentences in length—he had prepared for the plaintiff.

We find any surprise or prejudice suffered by the defendant as a result of the testimony given by Mr. Wrage insufficient to warrant a new trial. The defendant was aware Mr. Wrage would be called to testify, and though it was not given a copy of the witness' report until he took the stand, we find its length sufficiently short and its contents sufficiently comprehensible to rule that defendant was not denied the ability to conduct meaningful cross-examination of Mr. Wrage. Defendant may well have been surprised that Mr. Wrage's background was more impressive than it had thought, but we cannot rule that a defendant in a civil case is unduly prejudiced because an opposing party's witness is, for some reason or other, more credible than defendant had anticipated.

■ Defendant also seeks a new trial by challenging the damages awarded as excessive. While the sum awarded, $840,000 is certainly considerable, it is not our task to consider whether we personally would have made such an award. Indeed, it is not even

---

9. The court's instruction read:

The plaintiff claims that he suffered a posttraumatic personality disorder in addition to the physical injuries he sustained as a result of the accident in question. If you find that such personality disorder condition exists, you are instructed that a posttraumatic personality disorder which is associated with physical injury is compensable under our law if you are satisfied to a reasonable certainty, by the greater weight of the credible evidence, that such personality disorder was caused by the accident. In passing on the question as to whether the personality disorder of which the plaintiff complains was caused by the accident in question you are instructed that the accident need not be the sole cause of such personality disorder. You must be convinced, however, to a reasonable certainty, by the greater weight of the credi-

ble evidence, that the accident was one of the significant causes of the personality disorder. That is to say that the accident was a substantial factor in bringing about the disorder and had a substantial effect in producing the personality disorder of which the plaintiff now complains.

If you are satisfied that the personality disorder of the plaintiff was caused by the accident in question, as I have defined the question of cause for you, then you should include in your award a fair and reasonable allowance therefor. If you are not so satisfied, then you will make no allowance for the personality disorder and confine your award to fair and reasonable compensation for only such physical and personal injuries as resulted to the plaintiff from or was caused to him by the accident.

our task to decide whether, had we been presiding at trial, we would have set the verdict aside. Our task is simply to inquire whether the trial judge abused his discretion in concluding that there was credible evidence supporting the verdict. *E. g., Page v. American Family Mutual Ins. Co.,* 42 Wis.2d 671, 682, 168 N.W.2d 65 (1969). We cannot say the trial judge so abused his discretion.

■ In this case, parts of the award were stipulated and therefore need not be reviewed in considering this challenge. As to the disputed amounts, the jury awarded $40,000 for the expenses Joseph DeSantis could expect to incur in his lifetime as a result of his accident. In light of plaintiff's life expectancy, and the testimony by the prosthetist, Carl Caspers, regarding the frequency with which the plaintiff will have to purchase artificial legs and socks to cover his stump, and the cost of such items, we cannot say that the award of $40,000 was unsupported by credible evidence.

■ $300,000 was awarded the plaintiff for personal injuries, including pain and suffering for the six years from the date of the injury to the trial. Certainly, for the plaintiff, a child of six, to be the victim of an accident in which his lower legs and thighs were repeatedly slashed by the whirling auger blades in which he was trapped, had to be a terrifying experience. Within the year, he was then subject to four major surgical procedures which, when completed, left him without one leg and some of the toes on the leg remaining. In the next six years this little boy had to accept the fact that physically he was always going to be different from other children, that there would always be things he could not do, or would be too embarrassed to do. That Joseph DeSantis has done well in school, that he has sought physical normalcy in his life wherever possible, be it in having a paper route of sorts, or in actively participating in games such as baseball and basketball, simply cannot be treated as anything but a marvelous accomplishment on his part. What it cost him both mentally and physically to suffer through this acci-

dent, the attending operations, and ultimately, to achieve these goals, cannot be fixed with accuracy by any of us. But it in no way seems a denial of justice for the trial court to have upheld the jury award of $300,000 for the suffering of these six years.

■ $500,000 was awarded for future damages. Defendant, in arguing, "that Joseph DeSantis has adapted very well to his injuries," thereby implies that future suffering will be minimal. But the fact remains, the boy has lost his leg, and there will not be a day in his life that he will not have to cope with that. The evidence suggests his physical activities will always be curtailed, and that those activities he does engage in will require increasing expenditures of his energy as the years go on. It is possible that any attempts at sexual involvement with women will be physically and emotionally draining for him. His job options are somewhat limited. He stands a greater risk of suffering arthritis than the average individual. As the trial court observed,

> To sum up the effects of the loss of a young boy's leg and part of his other foot, there will be a lot of his life that he cannot really live, and that part of his life that he does live will always be adversely affected to some degree by disabilities.

Because we concur in this assessment of the plaintiff's future, we cannot grant defendant's request for a new trial on damages. We agree that the award is near the upper limit, but under the circumstances noted and, in light of the trial judge's approval, we do not deem it so large as to be excessive.

Finally, defendant argues that a new trial is in order because the evidence does not support the jury's findings with respect to Questions 1–9 of the special verdict. Essentially, these questions deal with the various degrees of culpability among defendant, the boy's parents, and distributor Schrank regarding the accident. As already noted regarding defendant's allegation of error as to the court's instruction on installers' duty of care, any error in apportioning liability

among those contributing to an injury would at most result in a new trial among those liable parties. It would not result in a new trial with the injured party, which is what Parker Feeders here seeks. Moreover, we do not find reversible error as to the special verdict. In *Continental Airlines, Inc. v. Wagner-Morehouse, Inc.*, 401 F.2d 23 (7th Cir. 1968), this court observed:

> "If the evidence in the record, viewed from the standpoint of the successful party, is sufficient to support the jury verdict, a new trial is not warranted merely because the jury could have reached a different result. Neither the trial court nor this court may substitute its judgment for that of the jury on disputed issues of fact." *Id.* at 30.

We have reviewed the record in light of this standard and must concur with the trial court that the evidence was sufficient to support the jury's findings with respect to each of these questions. Nothing in defendant's brief persuades us to the contrary.

The judgment appealed from is AFFIRMED.