**PORTAGE II and Portage IV, Plaintiffs–Appellants,**

v.

**BRYANT PETROLEUM CORP., et al., Defendants,**

**Dr. Clarke N. Simm, Defendant–Appellee.**

**No. 89–3118.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 2, 1989.

Decided April 6, 1990.

Rehearing and Rehearing En Banc Denied June 7, 1990.

E. Joel Wesp (argued), Kevin J. Oster-kamp, West & Osterkamp, Columbus, Ohio, for plaintiffs-appellants.

Joseph C. Winner (argued), Casey, McFadden & Winner, Columbus, Ohio, for defendant-appellee.

Before KEITH, JONES and GUY, Circuit Judges.

KEITH, Circuit Judge.

Plaintiffs Portage II and Portage IV, Illinois limited partnerships, appeal from the district court's January 3, 1989 post-trial judgment which dismissed all claims asserted against defendant Dr. Clarke N. Simm ("Simm").[1] Portage II argues that as a matter of law, the district court erred in finding for Simm on the claim of negligent misrepresentation particularly since the jury returned a verdict which the court had accepted. Furthermore, Portage II alleges that the district court abused its discretion in alternatively granting a new trial on that issue. For the foregoing reasons, we REVERSE and order the district court to reinstate the jury verdict of July 27, 1988.

### I.

Portage II and Portage IV were formed for the sole purpose of drilling oil and gas wells in Portage County, Ohio.[2] The co-partners of each limited partnership, Gerald Mandel ("Mandel") and Ronald Tausend ("Tausend"), are financial consultants who organized the partnerships and sold limited partnership interests to investors. Bryant Petroleum Corporation ("Bryant"), a Nevada Corporation, sold oil and gas leases to Portage II and Portage IV. James Lindquist ("Lindquist") is the president and sole shareholder of Bryant.

Simm is a petroleum engineer who was employed by Bryant as a consultant at the time the oil leases were sold to Portage II.[3] Wray Petroleum Corporation ("Wray"), an Ohio corporation, subcontracted with Bryant to drill, complete and operate the Portage II wells. J. Robert Wray and Jack R. Torongo ("Torongo") were affiliated with Wray. Portage IV also contracted with Wray for the drilling and operation of its wells. During 1980 and 1981, James W. Greene ("Greene"), a geologist, prepared reports regarding the expected recoverable reserves from the oil wells drilled in Portage County.

In 1980, Bryant provided Mandel and Tausend with Simm's evaluation of Portage County. The evaluation was supplied to Mandel and Tausend in return for their consideration of syndicating a venture to drill oil and gas. Simm prepared various written reports and projections on the commercial amount of gas and oil recoverable from the Portage County wells. Each document, as well as written and oral communications to Mandel and Tausend, were made to induce them to invest in the oil leases offered for sale by Bryant and to maintain investment in the field.

On December 26, 1980, while Simm was still employed by Bryant, Portage II entered into contracts with Bryant. Portage II purchased ten leases from Bryant and entered into an agreement to drill and operate wells in Portage County. The agreement executed between Portage II and Bryant, gave Portage II the option to terminate its involvement in the project after three wells had been drilled. Portage II alleged that its decision to purchase and invest in the leases offered by Bryant was based solely on the information provided by Bryant and Simm.[4]

In 1981, Portage II proceeded to drill seven wells. Relying on the information provided by Simm concerning the potential for commercial oil and gas development in Portage County, Portage II did not exer-

---

1. Although Portage II and Portage IV are named as appellants, only the issues concerning Portage II have been advanced on appeal.

2. Portage II and Portage IV were organized in December 1980, and December 1981, respectively.

3. Simm was employed by Bryant from 1979 through 1980 and was experienced in the oil and gas business. While at Bryant, his responsibilities included finding and evaluating properties worthy of oil and gas exploration and devel-opment. Under his compensation agreement with Bryant, Simm could realize up to 50% of the net profits derived from Bryant's oil and gas operations.

4. On December 31, 1980, Simm terminated his relationship with Bryant. He, nevertheless, remained active in the Portage II project due to his financial interest in the wells drilled as well as his affiliation with another company engaged in oil and gas exploration and production in that area.

cise its opt out provision.[5] Simm also encouraged Mandel and Tausend to invest in oil and gas leases in Nelson township. Simm provided written material to both men hoping that they would invest in the project. Portage IV's decision to invest also was made in reliance upon the representations made by Simm.

On December 11, 1985, Portage II and Portage IV commenced this action against several defendants[6] asserting claims of negligence, common law fraud and securities fraud under Rule 10(b)5 and Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982). Prior to trial, Portage II and Portage IV settled with all defendants except Simm.

A jury trial was held from July 14 through July 27, 1988. This appeal centers on the events that occurred after the close of the evidence.

On the afternoon of July 25, 1988, a charging conference was held between counsel and the court to arrive at the proper jury instructions. The next morning, the jury was instructed on the law and received specific instructions as to each cause of action. The jury was instructed at length regarding the law applicable to negligent misrepresentation and comparative negligence. In fact, on the issue of negligent misrepresentation, the court provided the jury with two sets of written questions referenced throughout the proceeding as *interrogatories*. In instructing the jury on the issue of comparative negligence the court stated:

> This brings us to a discussion of the Ohio rule of comparative negligence. The plaintiffs, Portage II and Portage IV, may have been negligent and would

nevertheless still recover damages from the defendant.

> However, a plaintiff's negligence, if any, may not exceed on a percentage basis the defendant's negligence. This rule of law is known as comparative negligence.

> It is comparative in the sense that the plaintiffs' negligence, if any, must be compared to the defendant's negligence, if any.

> Thus, if you find by a preponderance of the evidence in the case that either of the plaintiffs was negligent and that such negligence proximately caused or contributed to its injury, then you would further determine to what extent that plaintiffs' [sic] injury resulted from its own negligence compared with [sic] the negligence, if any, of the defendant.

> Now, I am going to give you two sets of written questions, *which are called interrogatories*, which you will answer if you do deliberate on this issue of negligent misrepresentation.

> Using these *interrogatories*, you will decide by the greater weight of the evidence the percentage of the plaintiffs' negligence, if any, that directly and proximately caused its own damages and the percentage of negligence, if any, of the defendant which directly and proximately caused any damage to the plaintiffs. You will express this decision in the form of percentages.

Trial Transcript, Proceedings ("Tr.") at 29–30 (emphasis added). Neither the court nor the parties *ever* referred to these written questions as special verdicts.[7]

That afternoon, the jury returned its verdict finding Simm guilty of negligent misrepresentation and Portage II contribu-

---

**5.** Simm argued at trial and again on appeal, that the evidence presented shows that Mandel and Tausend made the decision to drill Portage II wells four through seven during January or February 1981. He claims Tausend testified that the three-well opt out provision was a precautionary measure in the event that three "dry holes" (wells with no oil or gas in commercial quantities) were drilled. In essence, Simm argues, the opt out provision was negotiated with Bryant merely "for show." From the outset of the project, therefore, Mandel and Tausend

were determined to drill at least seven wells and were not influenced by Simm to drill wells four through seven.

**6.** This action was commenced against Bryant, Simm, Wray, Lindquist, Torongo and Greene.

**7.** The trial transcript reveals numerous instances where the written questions were referred to as interrogatories. Tr. at 31–34, 60, 63–65, 67, 69–71, 77, 81, 83, 86–88, 92, 99, 111–14.

torily negligent. In reviewing the jury's conclusions, specifically its conclusions on the negligence issue, the court commented:

You have then proceeded on to consider the claims of negligent misrepresentation. And in the case of the claims of Portage IV, you have answered the *interrogatories* indicating that you did find that the defendant was guilty of negligent misrepresentation and that the plaintiff, Portage IV, was also guilty of contributory negligence.

And you have assessed the negligence and allocated the negligence between the parties assessing 59 percent of the negligence to plaintiff Portage IV and 41 percent against the Defendant Clarke Simm and, accordingly, in accordance with my instructions have not determined any damages in that case because with those findings the plaintiff would be barred from recovery.

Now, however, in the case of Portage II, you have likewise indicated that the defendant was guilty of negligent misrepresentation and that the plaintiff was also guilty of contributory negligence.

However, your answer to question three in allocating a percentage of negligence allocated 18 percent to the plaintiff and 82 percent to the defendant although I see that originally you had reversed those findings, and they were crossed out. But you have not assessed any damages.

Now, if your answers to the *interrogatories* are really what you intended to find, then under the Court's instructions, you would have to determine damages in the case of Portage II because under that allocation of negligence the plaintiffs' negligence would be less than 50 percent, and the plaintiff would be entitled to recover damages.

So I think that I should send you back for further consideration.

Tr. at 55–58 (emphasis added).

On the morning of July 27, 1988, the court expressed concern about the jury's alleged "confusion" in its assessment of negligence with respect to Portage II:

They had originally written down, I forget their percentage, 82. They had attributed 82 percent of the negligence to the plaintiff and 18 to the defendant, crossed that out and reversed the figures and then, of course, they did not fill in the amount of damages so we have a completely ambiguous result.

Did they intend to find that plaintiff's negligence was less than defendant's or did they intend to find that plaintiff's negligence was more than defendant's?

Tr. 64. During this discussion, Simm's counsel raised the point that neither counsel had had an opportunity to review the interrogatories before they were presented to the jury. The court agreed that counsel had not reviewed the interrogatories and added that a verdict form had not been given to the jury. At no point, however, were the interrogatories reviewed by counsel before they were presented to the jury. The court concluded that the jury would hear further argument on the issues of negligent misrepresentation and damages. Additional argument was not permitted on any other issue.

The court informed the jury that additional proceedings would be conducted and that additional interrogatories had been prepared for the purpose of insuring that the jurors had properly performed their duties. Once the instructions on negligent misrepresentation were completed and additional arguments presented, the jury was directed to deliberate again. Immediately before re-deliberations, the foreman stated:

THE FOREMAN: Your Honor, the form that we filled out yesterday, *is that obsolete now* ?

THE COURT: In the case of Portage IV, you will decide whether or not that needs to be changed at all. *With regard to Portage II, yes, that is obsolete*, but we would like to have that. In fact, you can give that to Mr. Walters right now. It will be made a part of the record of the case, *but it doesn't represent your findings.*

Tr. at 91 (emphasis added).

Later that day, the jury returned a verdict finding Simm not liable with respect to

the first three Portage II wells.[8] For Portage II wells four through seven, however, Simm was found liable and Portage II contributorily negligent. Responsibility was apportioned 64 percent to Simm and 36 percent to Portage II. Damages totaled $1,509,000. After consultation with counsel and polling of the jury, the court stated: "Very well. Ladies and gentlemen, the Court will *accept* your findings in regard to the claims of Plaintiff Portage II." Tr. at 115 (emphasis added). The jury was discharged.

In response to the judgment entry, the court stated:

> *I will take care of that.* I will simply do the mathematical calculations required by the Ohio Comparative Negligence Act and prepare an appropriate judgment.

Tr. at 117 (emphasis added). By the end of the day, the jury's special interrogatory form was filed with the Clerk of the Court but the judgment was not.

During the course of the trial, Simm never moved for a directed verdict. Yet, on August 15, 1988, Simm filed a post-verdict motion to dismiss all claims asserted against him or, alternatively, to grant a new trial. The motion was premised on an alleged insufficiency of evidence and the court's authority to act under Federal Rule of Civil Procedure 49(a) pertaining to use of special verdicts. Portage II filed responsive pleadings.

On January 3, 1989, more than five months after the jury had reached its second verdict, the district court, relying on Rule 49(a), entered judgment in favor of Simm, and in the alternative granted a new trial on the issue of negligent misrepresentation.

On January 31, 1989, Portage II and Portage IV filed a timely appeal with this court.

## II.

Most federal cases are resolved by a general verdict wherein the jury finds for the plaintiff or defendant. 9 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2501, at 484 (West 1971) (hereinafter C. Wright & A. Miller). Federal Rule of Civil Procedure 49 provides two alternatives to the general verdict:

> Under subdivision (b) the judge may, if he sees fit, ask the jury to return a general verdict, but to accompany it with answers to *certain* interrogatories about *particular issues* in the case. Under subdivision (a) the court is given authority to dispense with the general verdict altogether, and to submit the various fact issues in the case to the jury in the form of *individual fact questions*, on each of which the jury is to return a special verdict.

*Id.* at 484–85 (emphasis added); Fed.R. Civ.P. 49. In fact, "special interrogatories" or "general verdict[s] accompanied by answers to interrogatories" are quite distinguishable from "special verdicts." One commentator suggests that:

> A special verdict is one in which the jury finds *all* the facts and then refers the case to the court for a decision on those facts. It is rendered in lieu of a general verdict and contains findings on *all* material issues in the case. Special interrogatories, on the other hand, are propounded as *selected* issues of fact, and answers to them are always, or at least normally, given in connection with, not in substitution of, a general verdict.

Annotation, *Submission of Special Interrogatories in Connection with General Verdict under Federal Rule 49(b), and State Counterparts,* 6 A.L.R.3d 438, 440 (1966) (emphasis added). *See* 76 Am.Jur.2d *Trial,* § 1175 (1975).[9]

---

**8.** The verdict returned on the Portage IV wells found Simm guilty of negligent misrepresentation and Portage IV guilty of contributory negligence. Responsibility was apportioned 59 percent to Portage IV and 41 percent to Simm. Portage IV, therefore, was not entitled to recovery.

**9.** Even though the procedures available under both subdivisions of Rule 49 are different, they frequently are confused. *See* Brown, *Federal Special Verdicts: The Doubt Eliminator,* 44 F.R.D. 338, 339 n. 5 (1967).

■ The main purpose of Rule 49(a) "Special Verdicts" is to eliminate the common law requirement that the jury return a finding on every element of the cause of action whether or not it was at issue in the case. *See* Comment, *Special Verdicts: Rule 49 of the Federal Rules of Civil Procedure,* 74 YALE L.J. 483, 502 (1965). This hazard of the common law special verdict is avoided with Rule 49(a). Today, under the special verdict system, the jury makes formal findings on issues of ultimate fact and the court applies the law. *See id.;* C. Wright & A. Miller, § 2503, at 488. The special verdict also avoids the two sources of possible error in general verdicts, namely the consideration of questions of law and the application of the law to the facts. Since the jury does nothing more than report the facts under the special verdict system, the jury is completely removed from considering and applying the law. Therefore, the special verdict is viewed as bringing the jury determination "into the open, where all can see what has been done." *Id.*[10]

A practical advantage of special verdicts, as well as general verdicts with interrogatories, is that they increase judicial efficiency by reducing the possibility for new trials. Since the jury's analysis is revealed by the questions presented on the verdict form and their corresponding answers, the court can easily determine where the jury went astray and the impact of their answer on the ultimate decision. *See id.* § 2505, at 494–95. Special verdicts are particularly useful where the law is uncertain or in its early stages of development. In such areas, errors in a case will not warrant a new trial because special verdicts will show that they had no effect on the result. *Id.*

■ Whether a special or general verdict is given rests in the discretion of the trial court. Although Rule 49(a) does not require that special verdicts be submitted when the instructions are first given, the decision is usually made before the initial submission. *Id.* § 2505, at 492. Generally, if the court determines that special verdicts shall be used in a particular case, counsel are notified in advance so that they may determine all of the issues that must be submitted, prepare requested charges and plan an effective closing argument. *Id.* When the special verdicts have been prepared counsel should, at minimum, be provided with an opportunity to review them.

■ Rule 49(b), on the other hand, allows the court to submit to the jury the appropriate forms for a general verdict, in addition to written interrogatories on one or more issues of fact. *Id.* § 2511, at 521; Fed.R.Civ.P. 49(b). The general verdict with interrogatories may be viewed as a middle ground between the special verdict and the general verdict, although it does have some unique virtues. The general verdict with interrogatories affects the *weight* given to certain factors; it requires the jury "to give close attention to the *more important* issues and their answers serve to check the propriety of the general verdict." *Id.* (emphasis added).[11] It is in the court's discretion whether to submit written interrogatories in connection with a general verdict. *Id.* § 2512, at 523. The court has a similar discretion in deciding not only what issues to submit, if it chooses to use Rule 49(b), but also in choosing the form in which these issues are submitted. *Id.* This decision should be made before the case is submitted to the jury and as with the special verdicts, counsel should: first, be notified that Rule 49(b) will be used; and second, be provided with an opportunity to review the interrogatories. In addition, judicial economy is advanced through the use of written interrogatories. Because the jury's analysis is identified in their responses to the written questions, the potential for a new trial is diminished.

■ In the present case, the district court premised its judgment upon the use

---

**10.** "... [I]t enables the public, the parties and the court to see what the jury has really done." Sunderland, *Verdicts: General and Special,* 29 Yale L.J. 253, 258 (1920).

**11.** *See also* Comment, *Special Verdicts: Rule 49 of the Federal Rules of Civil Procedure,* 74 Yale L.J. 483, 501 (1965); Wicker, *Special Interrogatories to Juries in Civil Cases,* 35 Yale L.J. 296, 305–306 (1926).

of special verdicts at trial. Given the written questions presented to the jury, the form in which they were presented, and the issue that they were designed to resolve, under no stretch of this court's imagination were they special verdicts. The record reveals that the verdict form presented to the jury was nothing other than a general verdict accompanied by interrogatories as authorized under Rule 49(b).

As discussed above, under the special verdict system, the jury makes findings on all issues of material fact and the court applies the law. Here, the jury was presented with interrogatories on only *one* of several issues presented in this case. Twice, the jury was instructed at length on the legal requirements for negligent misrepresentation. The jury was specifically instructed:

> The parties and the public expect that you will carefully and impartially consider all of the evidence in this case, *follow the law as stated by the Court* and reach a just verdict regardless of the consequences.

Tr. at 4 (emphasis added). Where special verdicts are involved, the jury's sole function is to determine the facts; therefore, neither an instruction on the law nor a summary concerning their role in relation to the law was necessary. If the written questions submitted to the jury were truly special verdicts, no instruction on the law, and certainly not one as detailed would have been given to the jury. The record plainly shows that the jury was instructed on the law in order to reach a verdict. The record also shows that written questions were submitted only for the issue of negligent misrepresentation. Both of these actions contradict essential elements of special verdict procedure.

Furthermore, the trial record demonstrates that other procedures essential to the use of special verdicts were not followed. It is well-settled that with either a special verdict or a general verdict with written interrogatories, counsel should be notified of the type of verdict that will be used and at least provided with the opportunity to review the questions before they are presented to the jury. Neither procedure was followed by the court. The only information counsel had concerning the written questions to be submitted to the jury was that the questions would address the comparative negligence issue. Counsel never saw the written questions before they were presented to the jury. In fact, even *after* this matter was brought to the court's attention, the court acknowledged that counsel had not been shown the questions but nevertheless failed to act. This is inconsistent with the practice generally followed in *any* situation where instructions or questions are written by the court, and certainly it is not desirable for special verdicts. C. Wright & A. Miller, § 2505, at 492. *See also Sakamoto v. N.A.B. Trucking Co., Inc.*, 717 F.2d 1000, 1006 (6th Cir.1983) ("We consider it the better and safer practice in all cases where Rule 49(a) is to be employed for the trial court to submit the actual special interrogatories ... to counsel in writing in advance of argument.... [b]ut the disclosure prior to final argument of at least the substance of the Rule 49(a) special verdict interrogatories ... is mandatory.").

It is evident from the face of the interrogatories themselves, that they were not intended to be special verdicts. Besides the fact that the written questions submitted to the jury were entitled *"Interrogatories,"* the questions were repeatedly referred to by both court and counsel as *interrogatories.*[12] The first time the interrogatories were referred to as special verdicts was when the term arose in Simm's post-verdict motion.

Even assuming, *arguendo,* that the questions submitted to the jury were special verdicts, the answers returned by the jury unquestionably indicate affirmative findings as to the questions of fact presented. Twice the jury was instructed on the elements needed for a negligent misrepresentation claim. Twice they returned responses to interrogatories finding that each element of the claim of negligent misrepresentation had been met with respect to Simm.

12. *See supra* note 7.

Given the above, it is difficult for this court to understand why the jury's verdict should not be followed—especially since the district court *accepted* the verdict and gave assurances that it would merely perform the proper computations under the Ohio Comparative Negligence Act. If we view the interrogatories solely as special verdicts, then the court's sole function is to apply the law to the facts as determined by the jury. Even in a perfunctory application of the law to the facts as defined by the jury, Simm is still guilty of negligent misrepresentation.

Given all of the evidence presented and the record below, we cannot find that written interrogatories, supplied to the jury on one issue, constitute a special verdict. Moreover, even if we accept that the requirements for special verdicts were met, the mere application of the law to the facts yields the same result—Simm is guilty of negligently misrepresenting to Portage II the profitability of wells four through seven.

## III.

■■■ It is well-settled that a court can only consider a motion for a judgment notwithstanding the verdict *only if* the moving party has previously made a motion for a directed verdict at the close of all the evidence. 5A J. Moore & J. Lucas, MOORE'S FEDERAL PRACTICE ¶ 50.08 (2d ed.1989) (hereinafter J. Moore & J. Lucas). *See also Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 473 (2d Cir.1985) (holding that failure to timely move for a directed verdict precludes a later grant of judgment notwithstanding the verdict); *Hubbard v. White*, 755 F.2d 692, 695 (8th Cir.), *cert. denied*, 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985) (holding that plaintiff's failure to move for directed verdict at the close of the evidence precluded a later grant of judgment n.o.v.); *Rawls v. Daughters of Charity of St. Vincent DePaul,*

*Inc.*, 491 F.2d 141, 147 (5th Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1974) ("[A] motion for directed verdict is a prerequisite for relief on a motion for a j.n.o.v. under Fed.R.Civ.P. 50(b)."). Federal Rule of Civil Procedure 50(b) provides:

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict.

*Id.* Therefore, a party who has failed to move for a directed verdict at the close of all the evidence, can neither ask the district court to rule on the legal sufficiency of the evidence supporting a verdict for his opponent nor raise the question on appeal. *See Southern Railway Company v. Miller*, 285 F.2d 202, 206 (6th Cir.1960); J. Moore & J. Lucas, ¶ 50.08. *See also Stewart v. Thigpen*, 730 F.2d 1002, 1006 (5th Cir.1984) (since plaintiff failed to move for a directed verdict during trial, he was precluded from raising the issue of sufficiency of evidence on appeal); *DuPont v. Southern Pacific Co.*, 366 F.2d 193, 198 (5th Cir.1966) ("[T]here was no request for a direct verdict under Rule 50 ... and thus the appellate court is powerless to review the sufficiency of the evidence.").[13]

In *Southern Railway Co. v. Miller*, 285 F.2d 202 (6th Cir.1960), we held that where no motion for a directed verdict was made,

---

**13.** There is, however, a limited exception to this rule wherein only totally inconsistent special verdict responses justify a district court's consideration of a judgment n.o.v., even where a directed verdict was not requested. J. Moore & J. Lucas, ¶ 50.80 (Supp. 5A 1988–89). As discussed earlier, the written questions used in this case, on the issue of negligent misrepresentation, did not meet the necessary requirements for special verdicts. Therefore, this limited exception is not applicable.

the question of the sufficiency of the evidence to support the jury's verdict is not available as a ground for a motion for a new trial. *Id.* at 206. In *Rymer v. Davis,* 754 F.2d 198 (6th Cir.), *vacated and remanded on other grounds, Shepherdsville v. Rymer,* 473 U.S. 901, 105 S.Ct. 3518, 87 L.Ed.2d 646 (1985) we also stated:

A party against whom a verdict is rendered must comply with Federal Rule of Civil Procedure 50 to obtain appellate review of a claim that he is entitled to judgment as a matter of law. If a party moves for judgment notwithstanding the verdict after having failed to move for a directed verdict at the close of the evidence, an appellate court cannot order judgment for him (citations omitted). If the evidence was insufficient as a matter of law, however, the court can order a new trial.

*Id.* at 199–200. Both *Southern Railway* and *Rymer* indicate that the law is clear in this circuit that judgment notwithstanding the verdict is not proper unless preceded by a directed verdict at the close of the evidence.

Even in considering a motion for judgment notwithstanding the verdict, it is well-settled that the court must view the evidence in the light and with all reasonable inferences most favorable to the party who secured the jury verdict. J. Moore & J. Lucas, ¶ 50.07. *See also Morelock v. NCR Corp.,* 586 F.2d 1096, 1104 (6th Cir.1978) ("[E]vidence must be viewed in light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor."), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). *Accord Gillham v. Admiral Corp.,* 523 F.2d 102, 109 (6th Cir.1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976); *Perry v. Gulf, Mobile & Ohio R.R.,* 502 F.2d 1144 (6th Cir.1974).

■ In the present case, Simm never moved for a directed verdict; therefore he failed to secure his right to move for a judgment notwithstanding the verdict. In its January 3, 1989 Opinion and Order, the district court stated: "If defendant had

secured his right to move for a judgment notwithstanding the verdict pursuant to Fed.R.Civ.P. 50(b), the Court would have granted such a motion." Opinion and Order at 15. Granting Simm's motion to dismiss had the same effect as granting a judgment notwithstanding the verdict. We find that as a matter of law, the evidence was sufficient to support the jury's verdict; therefore, the district court's effectual judgment notwithstanding the verdict was not warranted. Since the evidence was sufficient as a matter of law, under *Rymer,* we see no need to order a new trial.

## IV.

■ Simm argues that even if this court fails to grant him a new trial, the district court's conditional grant of a new trial should stand. We are not compelled to allow a conditional grant to stand if it would be an abuse of discretion to allow a new trial. *See Powell v. Lititz Mutual Insurance Company,* 419 F.2d 62, 65 (5th Cir.1969); *Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532, 541 (2d Cir.), *cert. denied,* 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1965); *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 88–89 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). An abuse of discretion standard applies in reviewing the district court's conditional grant of a new trial, and the jury's verdict should be accepted if it was reasonably reached:

In ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, a district judge must compare the opposing proofs and weigh the evidence (citations omitted)....

\* \* \* \* \* \*

'[C]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' *Tennant v. Peoria & P.U. Ry. Co.,* 321 U.S. 29, 35 [64 S.Ct. 409, 88 L.Ed. 520] (1944); *Werthan Bag Corp. v. Agnew,* 202 F.2d 119, 122 (6th Cir.1953). Thus, while the district

judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached.

*Bruner v. Dunaway,* 684 F.2d 422, 425 (6th Cir.1982). *See also Berner,* 346 F.2d at 536 ("[W]here ... there is an evidentiary basis for the jury's verdict, the jury is free to discard or believe whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.").

■ Here, the record contains abundant indicia of judicial over-reaching on the special verdict issue, and it is reasonable to conclude that this conduct pervaded other aspects of the trial, including the new trial issue. The district court abused its discretion by construing the jury questions—which on their face were general verdicts with interrogatories—as special verdicts in order to obtain a favorable judgment for Simm. The district court disagreed with the jury's first *and* second verdict on the issue of negligent misrepresentation, and improperly substituted its interpretation of the facts and analysis of the witnesses' credibility for the jury's. Furthermore, the district court manipulated the Federal Rules by essentially granting a judgment notwithstanding the verdict under the guise of a motion to dismiss, and providing no basis for conditionally granting a new trial.[14] There is significant evidentiary basis for the jury's verdict. The jury was given specific and detailed instructions on the issues presented in the case; it was free to believe or disbelieve the evidence presented and to assess the witnesses' credibility. In reaching its verdict, the jury carried out its function and did not find Simm as credible as the district court deemed.

Our thorough examination of the record suggests that the district court merely granted Simm's motion for a new trial as an afterthought. There was absolutely no basis for the district court to conditionally grant Simm's motion for a new trial. Therefore, we find that the district court abused its discretion in conditionally granting Simm's motion for a new trial.

■ The district court's failure to state a basis for conditionally granting the new trial, provides another reason for finding that a new trial is unwarranted. Federal Rule of Civil Procedure 50(c) provides that if the district court grants a judgment notwithstanding the verdict, it must also rule on any pending motion for a new trial and specify the basis for granting or denying the motion for a new trial. Fed.R. Civ.P. 50(c). Moreover, if the judgment notwithstanding the verdict is reversed on appeal, it is within the appellate court's discretion to determine whether the case should be sent back for a new trial. We have held that a district court's contingent grant of a motion for a new trial after granting a judgment notwithstanding the verdict constitutes error where: the grounds for the contingent grant of a new trial are not specified; proper instruction of applicable law are given; and the record is bereft of prejudicial error. *See Ross v. Chesapeake & Ohio Railway Company,* 421 F.2d 328, 330 (6th Cir.1970).[15]

---

**14.** In its Opinion and Order, the district court claims that the evidence was insufficient to support a finding of negligent misrepresentation; therefore, it could grant a new trial on that issue. *See* Opinion and Order at 16. This position is meritless, because the district court admits that there was evidence to support the jury's verdict. The district court is usurping the jury's fact-finding function by re-weighing the evidence. Such disregard for the jury's function is a prime example of the district court's abuse of discretion.

**15.** In *Ross,* plaintiff, a railroad employee, brought an action under the Federal Employers' Liability Act, 45 U.S.C. § 51–60, for an alleged back injury caused by defendant's failure to provide him with a safe working place. The jury returned a favorable verdict for the plaintiff but the district court granted defendant's judgment notwithstanding the verdict and contingently granted its motion for a new trial. We found that the district court failed to specify the grounds for the contingent grant of a new trial as specified under Rule 50(c). Moreover, since the district court gave the jury detailed instructions on apportioning negligence and assessing

Here, as in *Ross*, the district court failed to specify the grounds for granting Simm's conditional motion for a new trial. On two different occasions, detailed instructions on negligent misrepresentation and contributory negligence were given to the jury. The jury made reasonable determinations as to liability and assessed the witnesses' credibility. The district court even *admitted* that there was evidence to support the jury's verdict. *See* Opinion and Order at 18.

Several circuits have held that under Rule 50(c), a conditional grant of a new trial can be reversed and the judgment reinstated.[16] Certainly, this case falls under the rubric of *Ross* and its predecessors. We have the authority to reinstate the verdict, and we believe the facts and circumstances presented in this case more than warrant our exercise of this power.

## V.

 Five months after the district court *accepted* the jury's verdict, the district court overturned it. There was absolutely no basis for the district court to overturn the jury's verdict. In addition to the fact that the jury had decided this issue twice and had reached the same conclusion, the evidence presented at trial was sufficient for the jury to find that Simm's representations to Portage II were false. The interrogatories presented to the jury were clear as to the elements needed for negligent misrepresentation. In fact, the district

court even described the instructions as being "comprehensive."

Simm was tried by a jury of his peers who found that the evidence presented was sufficient to find that his representations to Portage II concerning wells four through seven were false. We cannot ignore or disrespect the collective wisdom of the jury and the function it serves in our judicial system. *See Taylor v. Louisiana*, 419 U.S. 522, 527–28, 95 S.Ct. 692, 696–97, 42 L.Ed.2d 690 (1975); *Williams v. Florida*, 399 U.S. 78, 87–92, 90 S.Ct. 1893, 1898–02, 26 L.Ed.2d 446 (1970). Rarely, is a new trial granted after two verdicts have been rendered on the same facts in favor of the same party.[17] Certainly, a new trial is not warranted in this instance.

A general verdict was returned by the jury and accepted by the district court on July 27, 1988. The jury was discharged and the court indicated that as required by the Ohio Comparative Negligence Act, it would prepare an appropriate judgment. It did not. Instead, it accepted Simm's post-verdict motion and on January 3, 1989 —more than five months after the jury had returned its verdict[18]—issued an opinion and order granting judgment in favor of Simm on the issue of negligent misrepresentation. This action was particularly disturbing given that this was the jury's second verdict on the same issue, the court had accepted the verdict and had discharged the jury, and the court gave assurances to counsel pertaining to entering the judgment: "I will simply do the mathemati-

---

damages, we concluded that there was sufficient evidence in the record from which the jury could find the defendant negligent. Thus there was no reason to retry the case.

**16.** The Advisory Committee Note to Rule 50(c)(1) provides, in part:

And the appellant court, if it reversed the judgment n.o.v., may in an appropriate case also reverse the conditional grant of the new trial and direct that judgment be entered on the verdict. *See Bailey v. Slentz*, 189 F.2d 406 (10th Cir.1951); *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246 (9th Cir.1957), *cert. denied*, 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958) ...; *Peters v. Smith*, 221 F.2d 721 (3d Cir.1955); *Dailey v. Timmer*, 292 F.2d 824 (3d Cir.1961), explaining *Lind v. Schenley Industries, Inc.*, 278 F.2d 79 (3d Cir.),

*cert. denied*, 346 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960) ...; 3 Barron & Holtzoff, Federal Practice & Procedure § 1302.1 at 346–47 (Wright ed. 1958); 6 Moore's Federal Practice ¶ 59.16 at 3915 n. 8a (2d ed. 1954). Fed.R.Civ.P. 50(c), Notes of Advisory Committee on Rules, Subdivision (c).

**17.** In *Louisville & N.R. Co. v. Woodson*, 134 U.S. 614, 623, 10 S.Ct. 628, 631, 33 L.Ed. 1032 (1890), the Supreme Court stated that courts "rarely grant a new trial after two verdicts upon the facts in favor of the same party."

**18.** "[U]pon a special verdict or a general verdict accompanied by answers to interrogatories, the court shall promptly approve the form of the judgment, and the clerk shall thereupon enter it." Fed.R.Civ.P. 58(2).

cal calculations required by the Ohio Comparative Negligence Act and prepare an appropriate judgment." Tr. at 117.

For the foregoing reasons we REVERSE and order the district court to reinstate the jury verdict of July 27, 1988.