**KINGSLEY ASSOCIATES, INC.,
Plaintiff-Appellant,**

v.

**MOLL PLASTICRAFTERS, INC., Moll PlastiCrafters, Inc. (DEL), and Moll PlastiCrafters Limited, Defendants–Appellees.**

No. 94–1633.

United States Court of Appeals,
Sixth Circuit.

Argued June 5, 1995.

Decided Sept. 15, 1995.

---

Rodger D. Young (argued and briefed), Young & Associates, Southfield, MI, for Kingsley Associates, Inc.

Marjory G. Basile (argued), Frederick A. Acomb (briefed), Miller, Canfield, Paddock & Stone, Detroit, MI, for Moll PlastiCrafters, Inc.

Before: NELSON and RYAN, Circuit Judges; ECHOLS, District Judge.*

* The Honorable Robert L. Echols, United States District Judge for the Middle District of Tennes- see, sitting by designation.

ECHOLS, District Judge.

This case is on appeal from the United States District Court for the Eastern District of Michigan. Plaintiff, Kingsley Associates, Inc. ("Kingsley"), initially filed this action against Defendant, Moll PlastiCrafters,[1] contending that Moll PlastiCrafters breached a contract entered into between Kingsley and National Lock Corporation's PlastiCrafters Division ("National Lock") and later allegedly ratified by Moll PlastiCrafters. Alternatively, Kingsley has brought a claim seeking damages under a theory of unjust enrichment. Kingsley later amended its Complaint to add a claim under the Michigan Revised Judicature Act of 1961, Mich. Comp. Laws §§ 600.101–600.9947, which provides that an aggrieved party may recover treble damages for intentional failure to pay commission.

Moll PlastiCrafters subsequently filed a Motion for Partial Summary Judgment, arguing that the Michigan statute under which Kingsley sought treble damages violated the title-object clause of the Michigan Constitution. After initially denying Moll PlastiCrafters' motion, the district court reversed its previous decision, agreeing that the statute violated the title-object clause of the Michigan Constitution.

A jury trial was held from November 15, 1993 to November 18, 1993. Three issues were presented to the jury: (1) whether Moll PlastiCrafters had ratified the contract between Kingsley and National Lock, thereby obligating Moll PlastiCrafters to pay post-termination commissions to Kingsley; (2) if not, whether Moll PlastiCrafters had been unjustly enriched by retaining the benefit of Kingsley's efforts without compensation; and (3) whether Moll PlastiCrafters' failure to pay Kingsley commission was intentional.[2] The jury returned a verdict for Kingsley on its breach of contract claim, and thus, did not address Kingsley's claim of unjust enrichment. The jury further found Moll Plasti-

Crafters' failure to pay commission to be intentional. Accordingly, the district court entered judgment for Kingsley.

After the trial, Moll PlastiCrafters renewed its Motion for Judgment as a Matter of Law and, in the Alternative, for a New Trial, arguing that Kingsley had not produced sufficient evidence upon which a reasonable jury could find that Moll PlastiCrafters could be charged with knowledge of a post-termination commission provision in the contract between Kingsley and National Lock or had agreed to pay such commissions. Moll PlastiCrafters also disputed the submission to the jury of Kingsley's claim of unjust enrichment and intentional failure to pay commission. On February 1, 1994, the district court entered an order in which it: (1) granted in part Moll PlastiCrafters' Motion for Judgment as a Matter of Law, finding no evidence upon which a jury could reasonably conclude that Moll PlastiCrafters ratified the contract between Kingsley and National Lock; (2) conditionally granted Moll PlastiCrafters' Motion for a New Trial on Kingsley's breach of contract claim in the event that its holding is reversed on appeal; (3) struck the jury's finding of "intentionality"; and (4) ordered a new trial on Kingsley's unjust enrichment claim.

On March 22, 1994, Moll PlastiCrafters filed a Motion for Summary Judgment on Kingsley's remaining claim of unjust enrichment, arguing, among other things, that Moll PlastiCrafters had an implied-in-fact contract with Kingsley which barred a claim of unjust enrichment. On May 3, 1994, the district court found for Moll PlastiCrafters on that ground and granted its motion, entering final judgment for Moll PlastiCrafters. Kingsley timely appealed to this Court.

## I.

Kingsley is an independent sales representative that specializes in promoting and sell-

---

1. While the Style lists Moll PlastiCrafters, Incorporated; Moll PlastiCrafters, Incorporated (DEL); and Moll PlastiCrafters Limited as Defendants, these names all refer to one entity, which is referred to in this brief as "Moll PlastiCrafters."

2. Michigan Compiled Laws § 600.2961 provides for treble damages if the failure to pay commissions when due is intentional. Although the district court found this statute violated the Michigan Constitution, it allowed the issue to be presented to the jury to obviate the need for a new trial should its finding on the statute's constitutionality be reversed.

ing manufacturers' component parts to the automobile industry. In 1968, John O'Neill ("O'Neill"), the founder and then president of Kingsley,[3] orally agreed with Norman Yetterberg ("Yetterberg") of National Lock to represent National Lock and sell its plastic components to automobile manufacturers. For these services, Kingsley would receive a five percent (5%) commission [4] on all sales it procured for the "life of the part." Both Yetterberg and O'Neill testified that they understood the "life of the part" provision to mean that after Kingsley made an initial sale of a component part to an automobile company, it would receive commissions on all future sales of that part to that company, even if Kingsley was terminated as sales representative.[5]

In 1989, George Votis ("Votis") and Richard Fackler ("Fackler") [6] acquired the assets of National Lock's PlastiCrafters Division from National Lock's owner, Keystone Consolidated Industries ("Keystone"). Before purchasing the assets, Votis conducted a due diligence search in which he learned that Kingsley was National Lock's sales representative but stated that he learned nothing of an agreement between Kingsley and National Lock or any "life of the part" contract. At the time of the purchase, Kingsley was responsible for seventy-five percent (75%) of the sales of National Lock. The Asset Purchase and Sales Agreement between the parties provided that Votis and Fackler would assume the obligations and liabilities of National Lock's PlastiCrafters Division. In addition, Section 2.05 of the agreement provided:

**3.** John O'Neill was replaced as president of Kingsley by his son, James O'Neill in 1986.

**4.** The parties later agreed to reduce the commission to four percent (4%).

**5.** Kingsley asserts that the use of a "life of the part" provision is a common practice in the automobile industry because the sales representative must invest a great deal of time, effort, and money in securing the initial sale. Once the initial sale is made, the buyer may continue to use the part in the manufacture of its automobiles for many years. As many of the parts manufactured by Moll PlastiCrafters are functional items, such as plastic knobs, switches, and

Schedule 2.05 is a complete and accurate list and compilation of all:

(i) contracts (written or unwritten) relating to the Businesses with respect to which the Seller has any liability or obligation involving more than $25,000, contingent or otherwise, or which may otherwise have any continuing effect after the date of this Agreement, or which place any material limitation on the method of conducting or scope of the Businesses.

Schedule 2.05 did not identify a contract with Kingsley.

The Bill of Sale, Assignment and Assumption Agreement, another one of the closing documents of the sale, however, stated that Votis and Fackler assumed not only those contracts listed in Schedule 2.05 but also all contracts with National Lock's suppliers that were outstanding as of closing. Specifically, it provides that the purchaser agrees to perform and discharge in accordance with the terms thereof:

(i) all purchase orders and contracts with the Divisions' suppliers and customers that relate to the Businesses and are outstanding as of the Closing (as each such term is defined in the Purchase Agreement) *and* all obligations of Seller for further performance under all contracts that are outstanding as of the Closing and listed in Schedule 2.05 to the Purchase Agreement

. . .

(emphasis added).

After the acquisition, Votis and Fackler retained several of National Lock's top management employees. Among these was Ste-

latches, the buyer may use the same part for many model years. Even after the buyer discontinues use of such part, sales will continue for repair and replacement parts. Thus, to guard against opportunistic termination, in which the manufacturer terminates the sales representative to avoid having to pay commission on future sales, the independent sales representatives inserted "life of the part" provisions in their agreements, requiring that commissions continue to be paid despite termination.

**6.** Votis and Fackler acquired the assets through a company they formed for that purpose under the name Faster Five Acquisition, Inc., which was later changed to Galt Crafted Products, Inc.

ven Erickson ("Erickson"), whose job as Sales Manager required that he oversee independent sales representatives. In that capacity, he discussed the terms of the contract between Kingsley and National Lock with James O'Neill. At trial, Erickson testified that he was aware of the "life of the part" contract National Lock had with Kingsley and the fact that Kingsley would continue to receive sales commissions on the parts sold even if the contract was terminated. He also stated that Kingsley was paid in the same manner before and after the acquisition. In other words, Moll PlastiCrafters continued to pay Kingsley commissions for parts reordered after the acquisition, even though the initial sale of the parts had been made prior to the acquisition. Erickson resigned from Moll PlastiCrafters before Moll PlastiCrafters terminated Kingsley as its sales representative.

Prior to the acquisition by Moll PlastiCrafters, David Hauser ("Hauser") served as Engineering Manager for National Lock. After the acquisition, he was retained by the new buyers and given the position of General Manager. He served in this position for four months. Although there is some dispute as to the scope of his duties as General Manager of the plant, Hauser stated that he was never in a position to hire or fire outside sales representatives. Fackler testified that he gave him authority to "run the floor, work with sales reps." James O'Neill stated that he discussed the terms of Kingsley's contract with National Lock with Hauser. Hauser stated that he understood Kingsley's contract to be a "life of the part" contract, which required Moll PlastiCrafters to pay Kingsley commission as long as the part was sold.

Allen Payson ("Payson") was Kingsley's sales representative who handled the account with National Lock and, after the acquisition, with Moll PlastiCrafters. He testified that shortly before Moll PlastiCrafters terminated Kingsley as its sales representative, he had a conversation with Moll PlastiCrafters' General Manager Carl Dines ("Dines") and Sales Manager Larry Jones ("Jones"), in which they questioned what would happen if an independent sales representative were terminated. Payson testified that he told Dines

and Jones that the sales representative would continue to receive commissions after the termination for the life of the part and that he assumed Kingsley had such a contract with Moll PlastiCrafters because Kingsley included this provision in all of its sales representative contracts. Jones denied having such a conversation with Payson.

As owners of Moll PlastiCrafters, Votis primarily handled the negotiations of the acquisition of National Lock. After the sale, he had very little to do with the management or operation of the company, and Fackler oversaw the day-to-day operations. Following the acquisition, Fackler and other representatives from Moll PlastiCrafters met with Kingsley officials a number of times to discuss the sales representative relationship between Moll PlastiCrafters and Kingsley. Although the amount of commissions and terms of the parties' contracts were discussed at these meetings, the "life of the part" provision was never mentioned. In at least one meeting, however, James O'Neill testified that he told Fackler about the terms of Kingsley's prior contract with National Lock which had been continued with Moll PlastiCrafters. Soon after the last in this series of meetings, Fackler terminated Kingsley as Moll PlastiCrafters' sales representative and discontinued payments of commissions. Kingsley thereupon filed this lawsuit. Fackler and Votis contend that it was not until this time that they learned of the "life of the part" agreement.

## II.

### A. Implied-in-fact Contract

■ This Court reviews de novo the trial judge's determination that there was insufficient evidence to raise a question of fact for the jury. *Hill v. Marshall*, 962 F.2d 1209, 1217 (6th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993). If, when viewing all of the evidence in the light most favorable to the opposing party, reasonable minds could not find against the moving party, judgment as a matter of law is proper. *Id.*

■ After reviewing the record and hearing oral argument, we conclude that there

was sufficient evidence upon which a reasonable jury could conclude that Kingsley had a contract with Moll PlastiCrafters requiring that Moll PlastiCrafters pay Kingsley commission for the "life of the part" even after termination of Kingsley as Moll PlastiCrafters' sales representative.[7] That is, we find that Kingsley presented sufficient evidence by which the jury could have reasonably determined that Kingsley had an implied-in-fact contract with Moll PlastiCrafters requiring commissions to be paid for the life of the part regardless of whether Moll PlastiCrafters terminated Kingsley as its sales representative.

▮▮▮ Under Michigan law, an implied-in-fact contract arises between parties when those parties show a mutual intention to contract. *Erickson v. Goodell Oil Co.*, 384 Mich. 207, 180 N.W.2d 798 (1970). The terms of their agreement will be determined by their conduct or other pertinent circumstances surrounding the transaction. *Id.* Therefore, the jury's decision must be upheld if Kingsley presented sufficient evidence from which a reasonable jury could find that Kingsley and Moll PlastiCrafters had a mutual intent to continue the sales representative contract with the "life of the part" provision for payment of sales commissions post-termination.

▮▮▮ To prove that it had a mutual understanding with Moll PlastiCrafters regarding the "life of the part" agreement, Kingsley must first show that Moll PlastiCrafters had knowledge of the terms of the agreement. As Moll PlastiCrafters is a business entity, rather than a person, it is necessary to determine whose knowledge is attributable to it. Relying upon the Michigan Court of Appeals' decision in *Gordon Sel–Way, Inc. v. Spence Bros., Inc.*, 177 Mich.App. 116, 440 N.W.2d 907 (1989), *aff'd in part, rev'd in part*, 438 Mich. 488, 475 N.W.2d 704 (1991), in which

the court held that a business may be charged with the collective knowledge that its officers and agents acquired while acting within the scope of their authority, *id.* 440 N.W.2d at 911–12, Kingsley contends that the knowledge of management employees, such as Erickson, Hauser, and Dines, regarding the "life of the part" agreement is attributable to Moll PlastiCrafters. Moll PlastiCrafters interprets the language in *Gordon Sel–Way* somewhat differently, contending that the corporation is charged only with the knowledge of its officers and agents *"who are authorized and charged with the doing of the particular thing ...."* *Id.* 440 N.W.2d at 911 (emphasis added). Moll PlastiCrafters asserts that because only Votis and Fackler had actual authority to bind it to the terms of the "life of the part" agreement, it cannot be charged with the knowledge of its officers, agents, or other employees regarding the agreement with Kingsley. We disagree.

▮▮▮ *Gordon Sel–Way* does not require that the employees acquiring knowledge must possess particular corporate authority. The opinion merely states that the employee must acquire the knowledge while acting within the scope of the employment he or she is authorized to perform. *Id.* 440 N.W.2d at 911. Moll PlastiCrafters may be charged with the knowledge of any of its officers or management employees who acquired knowledge of the post-termination provision of the "life of the part" agreement while acting within the scope of their employment.

Kingsley presented sufficient evidence from which a jury could reasonably conclude that a number of Moll PlastiCrafters' management employees knew that Kingsley's contract with National Lock would require Moll PlastiCrafters to continue to pay commissions after Kingsley was terminated. It is undisputed Moll PlastiCrafters knowingly

---

7. While this case was submitted to the jury under the theory that Moll PlastiCrafters ratified the contract between Kingsley and National Lock, the Court finds that theory to be unsuited to the present case. Rather, the Court considers the relationship between Kingsley and Moll PlastiCrafters to be based upon an implied-in-fact contract. As the jury would have to make the same factual determinations under either a ratification theory or an implied-in-fact contract theory, rein-

statement of the jury's verdict is proper. To find that Moll PlastiCrafters ratified the contract, the jury must have determined that Moll PlastiCrafters' officers or employees whose knowledge is attributable to the company knew of the "life of the part" agreement and that Moll PlastiCrafters, through its agents, assented to those terms. Likewise, a finding of mutuality of assent is necessary to find an implied-in-fact contract.

continued to pay commissions to Kingsley on the sales of parts made prior to its acquisition of National Lock. Both Erickson and Hauser testified that they understood the meaning of the "life of the part" contract with Kingsley, although Moll PlastiCrafters questions their credibility and suggests they never actually knew the terms of the agreement. James O'Neill, however, testified that he had conversations with both Erickson and Hauser in which they discussed the terms of the contract. Payson also testified that he had a later conversation with Dines and Jones regarding a "life of the part" contract and post-termination commissions. Although Dines and Jones denied knowledge of a "life of the part" contract, Payson stated that he specifically told them he assumed Kingsley had such a contract with Moll PlastiCrafters because all of Kingsley's contracts were of this type.

■ Challenging the credibility of witnesses and raising doubts about the extent of their knowledge is not sufficient to uphold judgment as a matter of law if the jury resolves these fact questions in their own minds and there is sufficient evidence to support their decision. Only if there was no evidence upon which a reasonable jury could conclude that these witnesses had knowledge of the "life of the part" agreement should the trial judge reverse the decision of the jury. In this case, not only did Hauser and Erickson testify that they understood the Kingsley contract to be a "life of the part" agreement, but also James O'Neill testified that he explained the terms of the contract to Hauser and Erickson. Further, Payson's testimony reveals that Jones and Dines should have been aware that the contract called for payment of post-termination commissions.

Assuming there was insufficient evidence for a reasonable jury to find that Moll Plasti-Crafter's management employees knew of the "life of the part" agreement with Kingsley, there was still sufficient evidence upon which the jury could find that Votis and Fackler themselves knew of the "life of the part" agreement and its post-termination provision. First, Votis' testimony about his knowledge of the "life of the part" agreement with Kingsley was somewhat ambiguous. When pressed on the question, he answered, "I can't answer it yes or no." Further, Votis testified that he conducted a due diligence analysis of the company prior to the acquisition and he was aware that Kingsley was responsible for seventy-five percent (75%) of the sales of National Lock's PlastiCrafters Division. The jury could reasonably assume that Votis would have inquired about the terms of the contract of such a major sales representative of the company's products during his due diligence study.

Second, James O'Neill stated that at a meeting among several representatives of Kingsley and Moll PlastiCrafters, he told Fackler the terms of the contract Kingsley had with National Lock which had been continued with Moll PlastiCrafters after the sale. While Fackler denies having such a conversation, it is the job of the jury to determine the credibility of each witness' testimony.

Lastly, and most importantly, it is undisputed that Votis and Fackler knew that Moll PlastiCrafters continued to pay Kingsley sales commissions on pre-acquisition parts sales. If Votis and Fackler believed that Moll PlastiCrafters was obligated to pay sales commissions only for services rendered while Kingsley was under its employ, then it would not have paid Kingsley for any pre-acquisition sales. The jury could have reasonably determined that since Moll Plasti-Crafters continued to pay Kingsley commissions on parts initially sold to manufacturers prior to the acquisition, Votis and Fackler must have known that its obligation to pay sales commissions would continue as long as Moll PlastiCrafters continued to sell the parts represented by the initial sale. Thus, it was reasonable for the jury to conclude that Votis and Fackler understood that Moll PlastiCrafters could not terminate its obligation to pay sales commissions simply by opportunistically terminating Kingsley. Therefore, we find that Votis' and Fackler's knowledge of Moll PlastiCrafter's obligation to pay sales commissions on pre-acquisition sales procured by Kingsley is sufficient evidence to create an inference that Votis and Fackler knew of the "life of the part" agreement and its post-termination provision. Their knowledge, of course, is attributable to Moll PlastiCrafters.

Once it established that the responsible agents of Moll PlastiCrafters had knowledge of the terms of the "life of the part" agreement, Kingsley must then show that Moll PlastiCrafters, through its agents' language or conduct, intended to agree to those terms. *Erickson,* 180 N.W.2d at 800. The jury could have reasonably inferred assent to the terms of the "life of the part" contract from Moll PlastiCrafters' continuing payment of commissions for more than three years for sales made prior to the acquisition. Continuing to pay Kingsley commissions not only reflects Moll PlastiCrafters' knowledge of a continuing obligation to pay commissions after sales are made but also an assent to these terms. Therefore, we find that there was sufficient evidence upon which the jury could have found a mutual intention to create an implied-in-fact contract requiring the payment of post-termination commissions. Accordingly, the decision of the district court to overturn the jury's verdict and grant Moll PlastiCrafters' Motion for Judgment as a Matter of Law is hereby REVERSED.

As we have determined that there was sufficient evidence upon which the jury could reasonably conclude that the parties formed an implied-in-fact contract, it is unnecessary for the Court to address whether Kingsley should recover under a theory of unjust enrichment. Any additional recovery under the theory of unjust enrichment is precluded by our finding of an implied-in-fact contract because the existence of an implied-in-fact contract, which provides a legal remedy, will bar a claim of unjust enrichment, which seeks an equitable remedy. *See Kammer Asphalt Paving Co., Inc. v. East China Township Schools,* 443 Mich. 176, 504 N.W.2d 635 (1993); *City of Detroit v. City of Highland Park,* 326 Mich. 78, 39 N.W.2d 325 (1949).

**B. Conditional Grant of a New Trial**

This Court may overturn the trial judge's decision to conditionally grant a new trial to Moll PlastiCrafters only if it finds that the decision constitutes an abuse of discretion. *Portage II v. Bryant Petroleum Corp.,* 899 F.2d 1514, 1523 (6th Cir.1990). This Court has defined an abuse of discretion as "a definite and firm conviction that the trial court committed a clear error of judgment." *Monette v. AM–7–7 Baking Co., Ltd.,* 929 F.2d 276, 280 (6th Cir.1991) (quoting *Logan v. Dayton Hudson Corp.,* 865 F.2d 789, 790 (6th Cir.1989)). Applying this standard, Kingsley argues that the trial judge's decision should be reversed because the jury's verdict is one that could reasonably have been reached. In *Portage II,* this Court reaffirmed that "a district court's contingent grant of a motion for new trial after granting a judgment notwithstanding the verdict constitutes error where: the grounds for the contingent grant of a new trial are not specified; proper instruction of applicable law are given; and the record is bereft of prejudicial error." *Id.* at 1524 (citing *Ross v. Chesapeake & Ohio Railway Co.,* 421 F.2d 328, 330 (6th Cir.1970)). In the present case, the only rationale given for the conditional grant of a new trial was that the jury's verdict was against the clear weight of the evidence, without any further elaboration. No one has disputed the propriety of the jury instructions or suggested the existence of prejudicial error. Therefore, the trial judge's conditional grant of a new trial constitutes error under the standard adopted by the Sixth Circuit in *Portage II.*

Several other courts have taken the position that, while an appellate court should give great deference to a lower court's denial of a motion for new trial, an appellate court should be more skeptical of the grant of a new trial, and an appellate court's review of the grant of a new trial should be more substantial than the review of a denial. In *Rixey v. West Paces Ferry Hospital, Inc.,* 916 F.2d 608 (11th Cir.1990), the court held that the review of a grant of a new trial requires a stricter application of the abuse of discretion standard "because when the jury verdict is set aside usual deference to the trial judge conflicts with deference to the jury on questions of fact." *Id.* at 612 (quoting *Hewitt v. B.F. Goodrich, Co.,* 732 F.2d 1554, 1556 (11th Cir.1984)). The court in *Rixey* further cautioned that when a motion for new trial is granted on evidentiary grounds, the verdict must, at a minimum, be "against the great—not merely greater—weight of the evidence." *Rixey,* 916 F.2d at 611 (quoting *Hewitt,* 732 F.2d at 1556). Given this standard, Kingsley contends that the

trial evidence is sufficient not only to survive a motion for judgment as a matter of law, but also to warrant the reversal of the conditional grant of a new trial and the reinstatement of the jury verdict. *See, e.g., Miles v. Vicksburg Chemical Co.,* 588 F.2d 512, 517 (5th Cir.1979); *Mays v. Pioneer Lumber Corp.,* 502 F.2d 106, 110 (4th Cir.1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975); *Continental Air Lines, Inc. v. Wagner–Morehouse, Inc.,* 401 F.2d 23, 31–32 (7th Cir.1968); *Lind v. Schenley Industries, Inc.,* 278 F.2d 79 (3rd Cir.1960), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).

Moll PlastiCrafters asserts that "appellate courts traditionally have been reluctant to overturn a trial court's order granting or denying a motion for new trial that is based on the ground that the verdict was against the weight of the evidence." *J.C. Wyckoff & Associates v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1487 (6th Cir.1991) (citing *Duncan v. Duncan,* 377 F.2d 49, 53 (6th Cir.1967)). The case cited by Moll PlastiCrafters for this proposition, however, affirmed a trial court's denial of a plaintiff's motion for a new trial because the jury's verdict was not unreasonably reached given the evidence presented. For that same reason, it is logical that this Court may reverse the grant of a new trial. This is especially true where the grant of a new trial is conditional. *See Douglass v. Eaton Corp.,* 956 F.2d 1339, 1346 (6th Cir. 1992); *Portage II,* 899 F.2d at 1525. The Court in this case has found that there was sufficient evidence to support the jury's verdict in favor of Kingsley. Therefore, the decision of the district court to conditionally grant a new trial is hereby REVERSED. Accordingly, the jury's verdict in favor of Kingsley is hereby reinstated.

## C. Michigan Revised Judicature Act

█ Finally, Moll PlastiCrafters has challenged the constitutionality of Michigan Compiled Laws § 600.2961, the provision of the Michigan Revised Judicature Act of 1961 ("RJA"), Mich. Comp. Laws §§ 600.101–600.9947, under which Kingsley sought treble damages for intentional failure to pay commissions. The title-object clause of the Michigan Constitution states: "No law shall embrace more than one object, which shall be expressed in its title." Mich. Const. art. IV, § 24. The district court held that because the title of the RJA indicates that it deals with jurisdiction and procedure in Michigan courts[8] but the particular provision of the RJA under which Kingsley sought treble damages concerns commissions due under a sales representative contract, that provision violates the title-object clause of the Michigan Constitution. This Court must review that decision de novo. *Rector v. General Motors Corp.,* 963 F.2d 144, 146 (6th Cir. 1992).

█ In determining the constitutionality of Section 600.2961 under the Michigan Constitution, this Court is, of course, bound by the decisions of the state's highest court. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Since the Michigan Supreme Court has not addressed this issue, however, we must predict how it would resolve the issue from "all relevant data." *Bailey v. V & O Press Co., Inc.,* 770 F.2d 601, 604 (6th Cir.1985). Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise. *FL Aerospace v. Aetna Casualty and Surety Co.,* 897 F.2d 214, 218–19 (6th Cir.1990), *cert. denied,* 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990) (quoting *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)).

█ This issue has been addressed by two Michigan state trial courts. *See Roberts v. USA Sign, Inc.,* No. 94–31919–CK (Mich. Cir.Ct. Nov. 23, 1994); *Kuieck v. Prime Technology, Inc.,* No. 94–0619–CZ (Mich.Cir.

---

**8.** The title to the RJA states:

AN ACT to revise and consolidate the statutes relating to the organization and jurisdiction of the courts of this state; the powers and duties of such courts, and of the judges and officers thereof; the forms and attributes of civil claims and actions; the time within which civil actions and proceedings may be brought in said courts; pleading, evidence, practice and procedure in civil and criminal actions and proceedings in said courts; to provide remedies and penalties for the violation of certain provisions of this act; and to repeal all acts and parts of acts inconsistent with, or contravening any of the provisions of the act.

Ct. Oct. 17, 1994). Unfortunately, they have reached opposite conclusions. We find that the better reasoned opinion is that of the Michigan Circuit Court of Muskegon County in *Roberts v. USA Sign, Inc.,* No. 94–31919–CK (Mich.Cir.Ct. Nov. 23, 1994). In *Roberts,* the court found that the title of the RJA is not merely limited to procedure. *Id.* It noted that the title of the RJA refers to the organization of the courts, the powers and duties of such courts, and the forms and attributes of civil claims and actions, all of which may refer to substantive rights. *Id.* We agree.

In *City of Livonia v. Dep't of Social Services,* 423 Mich. 466, 378 N.W.2d 402 (1985), the Michigan Supreme Court addressed the scope of the title-object clause, stressing that "it is not necessary for the title to be an index to all of the act's provisions." *Id.* 378 N.W.2d at 418. The Michigan Court of Appeals further elaborated in *Ace Tex Corp. v. City of Detroit,* 185 Mich.App. 609, 463 N.W.2d 166 (1990), that "[t]he goal of the title-object clause is notice, not restriction of legislation, and the title-object clause is only violated where the subjects are so diverse in nature that they have no necessary connection." *Id.* 463 N.W.2d at 169 (quoting *Builders Square v. Dep't of Agriculture,* 176 Mich. App. 494, 440 N.W.2d 639, 640 (1989)). In applying these principles, we find that Section 600.2961 does not violate the title-object clause of the Michigan Constitution. The RJA is a multivolume compilation of statutes enacted at various times on a number of subjects. The title of the RJA refers to the powers and duties of the courts. Section 600.2961 merely authorizes the courts to grant treble damages for intentional failure to pay commissions. As such, it clearly falls within the stated object of the RJA. Therefore, the district court's holding that Section 600.2961 violates the title-object clause of the Michigan Constitution is hereby REVERSED. As the jury has already made a finding that Moll PlastiCrafters intentionally failed to pay Kingsley its commissions due, Kingsley is hereby awarded in addition to its actual damages an amount equal to twice the amount of commissions due but not paid, not to exceed $100,000, as well as reasonable attorneys' fees and costs in accordance with Michigan Complied Laws § 600.2961.

### III.

For the reasons stated above, we hereby REVERSE the decision of the district court to grant Moll PlastiCrafters' Motion for Judgment as a Matter of Law. Likewise, the district court's decision to conditionally grant a new trial is hereby REVERSED, and the jury's verdict in favor of Kingsley is hereby reinstated. Furthermore, the district court's finding that Section 600.2961 is unconstitutional under the title-object clause of the Michigan Constitution is hereby REVERSED. In addition to its actual damages, Kingsley is hereby awarded twice the amount of commissions due but not paid, up to $100,000, as well as reasonable attorneys' fees and costs.